# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-DR-00517-SCT

*ROBERT SIMON, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/13/1990 |
| TRIAL JUDGE: | HON. THOMAS H. PEARSON |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | T.H. FREELAND, IV |
| ATTORNEY FOR APPELLEE: | OFFICE OF ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITIONS FOR LEAVE TO SEEK POST-CONVICTION RELIEF DENIED - 9/18/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Robert Simon, Jr. was convicted of three counts of capital murder in October of 1990, and sentenced to death on each count.  The charges originated from his participation in the murders of four members of the Parker family in Quitman County, Mississippi.  Simon had previously been convicted of one count of capital murder for the murder of Charlotte Parker, but the jury could not reach a unanimous verdict concerning his punishment so he was sentenced to life imprisonment.  *See* ***Simon v. State***, 633 So. 2d 407 (Miss. 1993) (***Simon I***), *vacated and remanded*, 513 U.S. 956, 115 S.Ct. 413, 130

L.Ed.2d 329 (1994), *on remand*, ***Simon v. State***, 679 So. 2d 617 (Miss. 1996).[1]  These three remaining convictions are for the murders of Carl, Bobbie Joe, and Gregory Parker that same evening. This Court affirmed these verdicts on direct appeal.  *See **Simon v. State***, 688 So. 2d 791 (Miss. 1997) (***Simon II***), *cert. denied*, 521 U.S. 1126, 117 S.Ct. 2524, 138 L.Ed.2d 1025 (1997).

¶2.    Simon filed a pro se petition for post-conviction relief and supporting memorandum with this Court on April 2, 1998, and also contemporaneously filed a motion for leave to amend this application should counsel be appointed to represent him.  Counsel was appointed on January 12, 2001, filed a separate petition for post-conviction relief on July 13, 2002, and filed a final amended petition for post-conviction relief on October 30, 2002.  Attached to this petition is a motion for leave to proceed in the trial court. This opinion addresses the claims raised in all three petitions.  The petitions seek relief from the guilty verdicts returned and death sentences imposed for the murders of Carl, Bobbie Joe, and Gregory Parker. After due consideration, we find the motion and petitions should be denied.

### FACTS

¶3.    Carl and Bobbie Joe Parker, and their children Charlotte and Gregory, were last seen alive leaving their church around nine o'clock the evening of February 2, 1990, to return to their home in Quitman County.  Two hours later, a passing motorist saw their house burning.  Their bodies were found inside. Carl, Bobbie Joe, and Gregory died from gunshot wounds.  Charlotte, although shot three times, died of smoke inhalation.

---

[1]The case was vacated and remanded for consideration in light of the United States Supreme Court's opinion in ***J.E.B. v. Alabama ex rel. T.B.***, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

¶4.     The Parkers' stolen pickup truck was found parked near the residence of Robert Simon's mother-in-law, in nearby Clarksdale, Mississippi.  Police spotted two black men fleeing the cab of the truck almost an hour after the house fire was discovered.  In the bed of the pickup were several items taken from the Parkers' residence.  A shotgun and two revolvers were found near the pickup. The Parkers had been shot with revolvers of the same caliber as the revolvers found near the truck.  A witness identified Simon as one of two men who had stolen those two guns from her less than a week earlier.  Acting upon a tip provided by Simon's wife, police discovered a pair of wet coveralls and work gloves smelling of smoke locked in a dumpster near the pickup truck.  The gloves belonged to Carl Parker.

¶5.     Simon and Anthony Carr were arrested the next day.[2]  Simon was wearing boots taken from the Parker residence when he was arrested.  Later, more property taken from the Parkers' home, including two wedding rings, was found inside an apartment leased by Simon and his wife in Memphis, Tennessee.  After his arrest, Simon was read his *Miranda* rights  and confessed to killing the Parkers to police at the Quitman County jail.  He also discussed the Parker murders with inmates of the Quitman County jail who later testified against him.

## STANDARD OF REVIEW

¶6.     According to Miss. Code Ann. § 99-39-27(5):

> Unless it appears from the face of the application, motion, exhibits and the prior record that the claims presented by such are not procedurally barred under Section 99-39-21 and that they further present a substantial showing of the denial of a state or federal right, the court shall by appropriate order deny the application. . . .

---

[2]Carr, in a trial conducted separately from Simon's trial, was convicted of four counts of capital murder.  *See* ***Carr v. State***, 655 So. 2d 824 (Miss. 1995).  Chronologically, Carr's trial occurred three months after Simon's trial for the murder of Charlotte Parker, and one month before Simon's trial for the murders of Carl, Bobbie Joe, and Gregory Parker.

Miss. Code Ann. § 99-31-27(5) (2000). *See also **Jaco v. State***, 574 So. 2d 625, 635 (Miss. 1990); ***Moore v. Ruth***, 556 So. 2d 1059, 1061 (Miss. 1990); ***Neal v. State***, 525 So. 2d 1279, 1281 (Miss. 1987). This Court accepts the well-pleaded allegations in the petition as true. ***Moore***, 556 So. 2d at 1061, 1062.

## DISCUSSION

¶7.    Simon raises claims of error in his Petition and Amended Petition which may be broken down into three categories: allegations of ineffective assistance of counsel; a violation of the disclosure rule announced in ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and a violation of the double jeopardy clause of the Fifth Amendment to the Constitution of the United States. In his pro se petition and supporting memorandum, Simon also alleges error with regard to the effective assistance of his trial counsel, denial of his right to counsel during interrogation, change in trial venue, and right to a fair trial. The State responds to some of these allegations by asserting that they are procedurally barred from examination by waiver or res judicata. Some of those allegations, as well as the remaining allegations which the State does not contend to be procedurally barred, are addressed on their merits below. The State ultimately contends that none of the issues cited for review have merit. We begin by determining whether any of the alleged errors assigned for review are procedurally barred.

## CLAIMS PROCEDURALLY BARRED

¶8.    Petitions for post-conviction relief provide prisoners with a procedure, limited in nature, to review those objections, defenses, claims, questions, issues or errors which in practical reality could not be or should not have been raised at trial or on direct appeal. Miss. Code Ann. § 99-39-3(2) (2000). Further, Miss. Code Ann. § 99-39-21 provides:

4

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.
>
> (2) The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.
>
> (3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.
>
> (4) The term "cause" as used in this section shall be defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal.
>
> (5) The term "actual prejudice" as used in this section shall be defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence.
>
> (6) The burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section.

Miss. Code Ann. § 99-39-21 (Supp. 2003). "[A]n alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that it has not been previously litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled." *Irving v. State*, 498 So. 2d 305, 311 (Miss. 1986).

The *Brady* violation claim

¶9.     The State alleges that examination of the *Brady* violation claim is procedurally barred as it was capable of being raised on direct appeal, and Simon has made no showing of cause and actual prejudice warranting relief from this waiver. It is uncertain whether Simon had knowledge of officer Thomas's testimony in the *Carr* trial during the trial of *Simon II*, thus making this issue capable of review on direct

5

appeal. This Court is merely left to consider Simon's allegation that he was not provided with this statement from the *Carr* transcript when it is possible that his attorney did indeed have it and used it. Accepting the facts alleged in the petitions as true, the State has failed to meet the burden for imposing a procedural bar here. The merits of the claim are examined below.

The Double Jeopardy claim

¶10. The State argues that Simon's double jeopardy claim has been decided against him in *Simon II* and is now procedurally barred from review by the doctrine of res judicata. Considering the language used in rejecting the arguments not discussed on the merits by the *Simon II* majority opinion, it is clear this issue was decided against Simon on direct appeal. The requirements for imposing the procedural bar of res judicata have been met. The doctrine of res judicata prohibits any further examination of this issue on its merits. Since this issue concerns a fundamental right, it is examined on the merits below in the alternative.

Petition and Amended Petition:  Ineffective Assistance of Counsel claims

¶11. The State argues that three of Simon's claims of ineffective assistance of counsel found in the Petition and Amended Petition are procedurally barred: (1) Simon's claim that his trial counsel was ineffective because he failed to offer any corroborating evidence that Simon's confession was coerced as both waived and barred by res judicata; (2) Simon's claim that his trial counsel was ineffective because he failed to object that Simon was not brought before a judge and appointed counsel in a reasonable time as barred by res judicata; and (3) Simon's claim that his trial counsel was ineffective because he failed to adequately question the jury venire about its views about the death penalty as barred by res judicata.

**A. Failure to offer corroborating evidence of police brutality/coerced confession**

¶12. The State asserts this claim of ineffective assistance is procedurally barred as res judicata because the issue whether Simon's confession was voluntary has been resolved against him. In *Foster v. State*,

6

687 So. 2d 1124, 1135-36 (Miss. 1996), this Court rejected a prisoner's attempt on petition for post-conviction relief to relitigate an issue restyled as a claim of ineffective assistance of counsel. The Court found the true issue had been considered and rejected on direct appeal. The Court concluded that the prisoner had "restated an old claim under a new title," and the Court was procedurally barred by the doctrine of res judicata from considering the issue of ineffective assistance on its merits. *Id.* at 1137. *See also Wiley v. State*, 750 So. 2d 1193, 1199-20 (Miss. 1999).

¶13.     We agree with the State that this issue is procedurally barred from review by the doctrine of res judicata. The true issue here is whether the trial court erred in admitting Simon's confession in light of evidence it may have been involuntarily made. In *Simon I*, this Court affirmed the trial court's finding that the confessions were voluntarily made. *Simon I*, 633 So. 2d at 412-13. On direct appeal in *Simon II*, this Court did not consider the merits of this issue because the opinion from *Simon I* rejecting this claim controlled, and the doctrine of res judicata prohibited reexamination of the issue. *Simon II*, 688 So. 2d at 810. Since the Court has ruled against him on direct appeal twice, we find that this claim of ineffective assistance of counsel is barred from review by res judicata. The merits of this issue are examined below in the alternative.

**B.     Failure to challenge confession admissibility due to delay in initial appearance**

¶14.     Simon's claim of ineffective assistance of counsel for failing to adequately challenge the admissibility of his confession because he was not taken before a judge and appointed counsel within a reasonable time after his arrest is likewise barred by the doctrine of res judicata. Again, we agree with the State that the true issue here is whether Simon was taken before a judge and appointed counsel within a reasonable time. *See* U.R.C.C.C. 6.03; *Swinney v. State*, 829 So. 2d 1225, 1230-33 (Miss. 2002). This attempt to

7

recast an old issue as a new one is rejected for the same reasons mentioned in the previous paragraph. This claim also has been rejected twice by this Court.

## C. Failure to adequately question venire about death penalty

¶15. Finally, the State alleges this Court is procedurally barred by the doctrine of res judicata from reviewing Simon's claim that his counsel was ineffective for failing to question the jury venire adequately about its views on the death penalty. The State asserts that this Court examined the issue in *Simon II* when it addressed Issue I, "The lower court erroneously removed for cause and prevented defense voir dire of several jurors who did not indicate that their views on capital punishment would substantially impair their ability to follow the law."

¶16. The allegation in Simon's Petition and Amended Petition differ from the issue addressed by the majority in *Simon II*. The issue in the petitions is one of ineffective assistance and not trial court error. It involves members of the venire which differ from those discussed by the *Simon II* majority on direct appeal. Although there are similarities to the challenges "for cause," we find that this issue is not procedurally barred because claims of ineffective assistance of counsel were not required to be raised on direct appeal–since trial and appellate counsel were the same–and the specific claim is not one covered by a previous allegation of error in either direct appeal.

Pro Se Petition Claims

¶17. In his pro se petition and supporting memorandum, Simon raises four claims as error which he listed on direct appeal in *Simon II*: (1) the denial of counsel during the interrogation before his first appearance; (2) the change in venue and resulting disparity in racial makeup of the venire; (3) the admission of his confession at trial; and (4) a specific juror was removed "for cause" from the venire in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Each of these issues is cited as error

8

on direct appeal in *Simon II*. *Simon II*, 688 So. 2d at 801-04, 806 (Issue II(A) and (C) covers venue and racial disparity), 807 (Issue V covers the *Batson* claim), 810 (Issue IX covers the *McLaughlin* delay in first appearance claim–see "B" above–as well as the confession's admission into evidence). Since each of these issues has been raised previously on direct appeal, Simon has waived reexamination of these facts under different legal theories. *See* Miss. Code Ann. § 99-39-21(2). Reexamination of these issues is also barred by the doctrine of res judicata. *See* Miss. Code Ann. § 99-39-21(3). Given the lengthy discussions of these issues in *Simon I* and *Simon II*, we will not reexamine the merits of these issues below.

¶18.    There are numerous allegations of error among these petitions which cite no supporting authority. See Am. Pet. ¶¶ 42-53; Pet. ¶¶ 30-41; Pro Se IV(h), (I), (j)(1)(a)-(c), (j)(2)-(5); Memo. Claim IV-Claim X(c), Claim XI -XIV, pp. 22-26. Even when this Court is considering a petition for post-conviction relief, the failure to cite authority means the petitioner's argument lacks persuasion and the issue may be barred from review. *Brown v. State*, 798 So. 2d 481, 497, 506 (Miss. 2001) (citing *Holland v. State*, 705 So. 2d 307, 329 (Miss. 1997)). *Cf. Gary v. State*, 760 So. 2d 743, 754 (Miss. 2000) (this Court may, at its discretion, refuse to review an assignment of error not supported by authority yet this is not an absolute bar). In the first instance, we find these alleged errors to be procedurally barred from review. Most of the issues affected are alleged in the pro se petition and memorandum, and they occasionally allege error similar to, if not exactly the same as, error alleged in his petition and amended petition. Where this has occurred, the examination of the similar issue and discussion of whether it is procedurally barred or without merit should suffice to address the issue in the alternative. Where the issues do not overlap and are not procedurally barred from examination, they are examined on the merits below.

9

¶19.    Finally, Simon alleges errors that were not raised on direct appeal and do not relate to the effectiveness of counsel: (1) the bias of the trial judge, (2) the lack of a fair trial due to the racial hostility of the jury, and (3) the preparation of the jury rolls.  Examination of these issues has been waived as no contemporaneous objection was made at trial and these were not cited as error on direct appeal.  *See* Miss. Code Ann. § 99-39-21(1).  Simon has not shown this Court cause to avoid enforcement of this bar, nor has he shown any prejudicial effect these allegations had upon his trial.  Therefore, examination of these issues has been waived, and we will not examine their merits below.

¶20.    Having stated which issues are procedurally barred, we will examine the merits of the remaining claims in the three petitions.

## CLAIMS EXAMINED ON THE MERITS

### I.    WHETHER SIMON'S TRIAL COUNSEL RENDERED HIM INEFFECTIVE ASSISTANCE DURING THE GUILT AND SENTENCING PHASES OF TRIAL.

¶21.    Simon claims his trial counsel was deficient during the guilt and sentencing phases of his trial.  He asserts that these deficiencies, individually or cumulatively, constitute reversible error.  The State responds that all the claimed deficiencies are without merit and disputes the application of cumulative error to claims of ineffective assistance of counsel.  We begin by reviewing the law of ineffective assistance of counsel.

¶22.    "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  ***Burns v. State***, 813 So. 2d 668, 673 (Miss. 2001) (quoting ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).  This Court restated the two-component test for establishing a claim of ineffective assistance of counsel recently in ***Benson v. State***, 821 So. 2d 823, 825 (Miss. 2002):

> To establish a claim for ineffective assistance of counsel the defendant must prove that under the totality of the circumstances (1) the counsel's performance was deficient and (2) the deficient performance deprived the defendant of a fair trial. *Hiter v. State*, 660 So.2d 961, 965 (Miss.1995) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

The petitioner must make both showings. *Wiggins v. Smith*, 539 U.S. ___, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Burns*, 813 So. 2d at 673; *Neal*, 525 So. 2d at 1281.

¶23. With regard to the showing of deficient performance, this Court's inquiry will focus on whether counsel's performance fell below an objective standard of reasonableness. *Wiggins*, 123 S.Ct. at 2535; *Williams v. Taylor*, 529 U.S. 362, 391, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. The determination will consider whether the assistance was reasonable under all the circumstances seen from counsel's perspective at the time, and the prevailing professional norms for attorneys. *Wiggins*, 123 S.Ct. at 2536; *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065; *Burns*, 813 So. 2d at 673; *Neal*, 525 So. 2d at 1281. Defense counsel is presumed competent, and this Court indulges a strong presumption that counsel's conduct is within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Burns*, 813 So. 2d at 673.

¶24. With regard to the deprivation of a fair trial, the petitioner must show how counsel's errors have prejudiced him. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067; *Burns*, 813 So. 2d at 673-74. The prejudice standard which the petitioner must meet in this respect is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Wiggins*, 123 S.Ct. at 2542; *Strickland*, 466 U.S. at 691-94, 104 S.Ct. at 2066-68; *Burns*, 813 So. 2d at 673-74.

11

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wiggins*, 123 S.Ct. at 2542; *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. By way of explanation, if the petitioner is challenging the conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. If the petitioner is challenging the sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068, 2069.

¶25. At this stage in the proceedings, this Court need merely consider whether Simon's petition, affidavits, and trial record render it sufficiently likely that he received ineffective assistance of counsel so that an evidentiary hearing should be held. *Neal*, 525 So. 2d at 1281. "Put otherwise, on the papers and record before us, can we say with confidence that at any evidentiary hearing (petitioner) will not be able to show that he has been denied effective assistance of counsel? If his application fails on either of the two prongs of *[Strickland v.] Washington*, we must terminate the proceedings here." *Id.*

Sentencing Phase: Failure to investigate and present mitigating evidence.

¶26. Simon alleges that his counsel ineffectively investigated and failed to put before the jury mitigating evidence which might have resulted in a life sentence. Specifically, he claims that (1) his psychological expert, Dr. William Kallman did not develop meaningful mitigation evidence due to time constraints and a conflict of interest, and (2) his attorney's investigation into his background was deficient because it did not reveal serious abuse at the hands of his father. Both, he claims, resulted in a weak case for mitigation being placed before the jury.

12

¶27.     Simon's case for mitigation spans forty-six pages of the eighty-eight covering sentencing in the record.  This does not include his cross-examination of the State's sentencing witnesses or closing arguments.  Simon called Dr. William Kallman, Antoinette Thomas, and Rosie Simon (his mother) to present mitigating testimony on his behalf.

¶28.     Dr. William Kallman was initially appointed to examine Anthony Carr in preparation for his quadruple murder trial.  After interviewing Carr, Dr. Kallman drew conclusions about his relationship with Simon that were particularly damning for Simon.  Among these conclusions were that Carr's relationship with Simon was as a son to a surrogate father, and Simon "was the leader and Anthony [Carr] the follower." Barely a week before the trial of *Simon I*, Dr. Kallman was appointed to examine Simon.  He met with Simon twice, interviewing him and administering tests of Simon's cognitive abilities and personality. The two meetings lasted a total of ten hours.  Dr. Kallman testified during the guilt and sentencing phases of both *Simon I* and *Simon II*.  *Simon I*, 633 So. 2d at 409; *Simon II*, 688 So. 2d at 798.  The evidence he provided at each trial does not differ in any substantial way, lending support to the conclusion that these meetings were the only times Dr. Kallman met with Simon and were the source of most of the information from which Dr. Kallman drew the conclusions he presented in both of Simon's trials.

¶29.     In the sentencing phase of *Simon II*, Dr. Kallman testified at length concerning Simon's job, family background, and his type of personality.  He stated that Simon did not graduate from high school but obtained his General Equivalency Diploma.  He held a string of jobs which did not suit him:  in the Army, at Parchman, and in the private sector.  He helped his mother with his siblings and loved his wife and daughter.  He was a "loner," and had no tendency towards engaging in frequent violent activities.  Dr. Kallman did not testify as to any abuse which might have occurred in Simon's home while he was growing up. *Simon II*, 688 So. 2d at 810-11.

13

¶30.	Neither did Simon's mother, although Simon had lived with her for most of his life. Rosie Simon testified that Simon helped her raise his siblings, gave her no trouble from school, and that she would not expect him to be violent. *Id.*

¶31.	Antoinette Thomas, a friend, had only known Simon for just over one year. She testified that Simon had a good, non-violent reputation, and she had seen him act kindly and heard reports of how kindly he behaved towards his child. *Id.*

¶32.	Attached to the amended petition for post-conviction relief are affidavits from Simon's older half-brother Jerry Games, Simon's younger brother Aaron Simon, Simon's mother Rosie, Joe Alford, Ph.D. (a psychologist), and Simon's wife Martha Simon (unsigned). Games states that neither trial counsel, his staff, nor Dr. Kallman asked him about Simon's relationship with his father or his childhood experiences. He goes on to relate how their father regularly beat them with a fan belt approximately the length of their father's forearm, and how witnessing this and being subjected to this upset Simon. Games continues by describing how Simon was a loner like his father, and he recalls instances where Simon would absent himself from his parents' house for days at a time. He also relates how he and Simon began stealing and how that antisocial behavior worsened over time.

¶33.	In his affidavit, Aaron Simon states he was never interviewed by trial counsel. His affidavit elaborates upon the beatings Simon's father administered, calling them "really bad," leaving bruises and welts that blood would seep from, and stating that it "seemed like he was hitting with all his might." He observed some of Simon's beatings.

¶34.	Rosie Simon describes Simon's father as a "funny-type" person who does not communicate frequently with anyone, even with her. She states that Simon witnessed his father beating his brother Games.

14

¶35. In his affidavit, Dr. Alford denounces Dr. Kallman's failure to corroborate his interviews with Simon by interviewing collateral sources of information. He speculates that Dr. Kallman restrained his testimony in *Simon II* because he had also done an evaluation of Anthony Carr. Furthermore, Dr. Alford censures Dr. Kallman's failure to testify about the evidence that Carr was psychotic.

¶36. Addressing first Simon's claim that his psychologist did not develop and offer sufficient evidence for mitigation due to time constraints and a conflict of interest, we note that a defendant is not entitled to the effective assistance of an expert witness. *Brown*, 798 So. 2d at 499. We consider the effects of the alleged conflict of interest and the allegedly poor investigation into Simon's abuse history by Dr. Kallman only for the purpose of determining whether Simon's trial counsel was somehow deficient.

¶37. Turning next to the claims of deficient investigation by Simon's trial counsel, we do not find that trial counsel's conduct fell below the ordinary standard of assistance of counsel because he did not inquire–without prompting–into the possibility of abuse of his client as a child. The affidavits attached to the petition, if taken as true, prove that there were witnesses capable of testifying in mitigation to this effect on Simon's behalf. However, none of the affidavits state that Simon's trial counsel was ever told before or during the sentencing phase of trial that Simon was abused as a child. Simon has failed to show in the record and in his affidavits that his counsel knew or had reason to know of his past abuse given his and Dr. Kallman's investigation. Having failed *Strickland*'s first component, the analysis ends here, yet we also note that Simon was not prejudiced by his trial counsel's failure to offer his history of being abused as a child as mitigation.

¶38. The aggravating circumstances proven below remove any doubt whether there was a reasonable probability the sentence might be different but for counsel's failure to offer Simon's abuse as a child as mitigating evidence. Carl and twelve-year-old Gregory Parker were bound hand and foot by their killers

and shot twice each. They were shot at point-blank range in the back, both times suffering contact wounds from the barrel of the gun which killed them. Carl's ring finger on his left hand was cut off by his murderer, and Gregory was beaten before he was shot. Both bled to death on the floor of their living room. Bobbie Joe Parker was shot in the chest and taken into a bedroom, which the murderers then set ablaze. Her severely-charred remains made her identification difficult once the police arrived and the fire was quenched. Evidence of Simon's abuse as a child, even if developed further at a hearing below, would not have had a reasonable probability of changing the jury's sentence from death to life had it been presented to them. Therefore, Simon's claim of ineffective assistance at sentencing also fails to satisfy *Strickland*'s prejudice component.

¶39.    To the extent Simon argues Dr. Alford's affidavit proves that Dr. Kallman should have testified as to Anthony Carr's occasional psychosis and troubled background, we find in the record that trial counsel's strategy was obviously to keep this information from the jury as it was developed by Dr. Kallman's interview of Carr. Carr's examination led Dr. Kallman to conclude that Simon was the leader in his relationship with Carr. Had Simon's trial counsel asked Dr. Kallman on the witness stand about his report on Carr's psychosis, the door to admitting Dr. Kallman's conclusions as to Simon's leadership would have been opened for the State to explore. The State could then have admitted the damning portions which indicate Simon's leadership in his relationship with Carr, thus making Simon's role in the murders more heinous. On cross-examination of Dr. Kallman during sentencing, the State attempted to elicit testimony about his conclusions concerning Simon's leadership in their relationship, but its attempt was thwarted by Simon's trial counsel's timely objections which the trial court sustained. This decision was a strategic one and does not supply grounds for a claim of ineffective assistance of counsel. To the brief extent Simon

16

argues his counsel was deficient in preparing his mitigation witnesses for cross-examination, a review of the record does not support this conclusion.

¶40. Considering the mitigation testimony offered at sentencing as a whole, a coherent case for Simon's non-violent personality being overcome by an instance of violence was presented to the jury by his trial counsel. His family, work, and school histories, as well as his good reputation, were effectively presented to the jury in the form of the testimonies of Dr. Kallman, Simon's mother, and Antoinette Thomas. Simon's trial counsel's use of Scripture and his pleas to the jury for mercy during his closing argument were in response to the State's use of Scripture and the strong case it made during its closing argument. Furthermore, a petition for post-conviction relief is not the forum to advance another theory of mitigation which trial counsel "should have" offered. Instead, it is the way a defendant calls attention to deficiencies in the way trial counsel actually presented mitigating evidence given the circumstances and information at the time. That Simon can now concoct a "better" case for mitigation provides no weight to the analysis of whether his trial counsel provided effective assistance when it was rendered in 1990.

¶41. Concluding the analysis of the sentencing phase of trial, Simon's allegations of error are without merit as they do not pass both components of the test for ineffective assistance of counsel found in *Strickland*. Simon has failed to show that it is sufficiently likely that he received ineffective assistance of counsel at the sentencing phase of his trial. Therefore, he is not entitled to a hearing on this matter, and the requested relief is denied.

Guilt phase: Failure to object to, corroborate, or contest certain evidence

¶42. Simon alleges that trial counsel's assistance was deficient during the guilt phase of his trial because: (1) counsel failed to offer corroborating evidence of his beatings at the suppression hearing, (2) counsel failed to object at trial that Simon was not brought before a judge within a reasonable time, and (3) counsel

17

failed to contest contradictions in the prosecution's case and the State's proof of certain elements necessary to prove the underlying felonies. The first two issues have previously been found to be procedurally barred. We will briefly discuss their merits now in the alternative.

¶43.    Simon alleges that his trial counsel was deficient for failing to corroborate his testimony at the suppression hearing with the testimony of his mother, wife, and brother, that he was beaten and his confession was coerced by police. He also submits that their testimony could have given the jury a reason to disregard the confession at trial had it been offered independently or to corroborate Dr. Kallman's testimony that Simon's confession to police had been psychologically coerced.

¶44.    The source of their information as to who was responsible for his visible injuries was Simon himself. Simon testified at the suppression hearing that he had been injured by police. He did not testify at trial. At the suppression hearing, the testimony of Simon's mother, wife, and brother would have added no weight to Simon's contention that his confession was coerced by the police who allegedly beat him. Ignoring the fact that Simon's statements to his family during their visit are self-serving and hearsay, to which most prosecutors would successfully raise an objection, their testimony would have been repetitive as well in light of Simon's testimony. They had nothing to say beyond what he told them and what he told the trial judge at the suppression hearing. The only independent value their testimony would have had is their personal observations of Simon's injuries during their visit. As these could have had other sources than police, it is doubtful that the trial court would have given any weight to their testimony concerning the origin of Simon's injuries.

¶45.    Therefore, Simon has failed to show how his trial counsel rendered him deficient assistance by failing to call his mother, wife, and brother as witnesses during the suppression hearing. Although Simon did not testify at trial, the testimony of his family members as to who had injured him would not have gotten

past an objection by the State. Their testimony as to the nature of his injuries during trial would border on the irrelevant as Simon did not testify. Dr. Kallman's testimony does not provide a basis for alleging police physically coerced Simon's confession because he only testified that Simon might have been psychologically intimidated into confessing because he had used the same tactics during his past experience as a jailer at Parchman. Furthermore, after the suppression hearing, Simon's counsel faced overcoming an adverse ruling by the trial court on the motion to suppress. Counsel's decisions with regard to this issue during trial are the product of a trial strategy. Simon has thus failed to pass the first component of **Strickland**.

¶46.    Assuming, for argument's sake, that trial counsel was deficient in this regard, Simon cannot demonstrate how counsel's failure to call his family members as witnesses at the suppression hearing or trial prejudiced his case. This Court has affirmed the trial court's judgment that Simon's confession to police was voluntarily made. **Simon I**, 633 So. 2d at 412-13; **Simon II**, 688 So. 2d at 810. This involved weighing Simon's own testimony against that of the officers present when he confessed. Simon's mother, wife, and brother were not present during the confession and could not testify with sufficient personal knowledge as to its voluntariness. Simon's own testimony at the suppression hearing was sufficient to raise the factual issue, but his testimony was contradicted at the suppression hearing and not even offered at trial. Simon had his day in Court on this issue. Simon also confessed his involvement in the murders to his cellmate. Had Simon's confession to police been excluded, there would still exist his inculpatory statements to his cellmate, his presence during the robbery to get the guns used in the murders, the Parkers' belongings found at his Memphis apartment, his observed flight from the Parkers' pickup truck the night of the murder, and the fact that he was wearing some of the clothing stolen from the Parkers when he was arrested. Had the jury been privy to the testimony of Simon's family about his injuries at trial, there would be little reason for the jury to disregard Simon's confession to police as there is little else in the record to establish its

19

involuntariness. Therefore, Simon fails to demonstrate how trial counsel's failure to call his family members at the suppression hearing and trial prejudiced the trial court's ruling on the issue or the outcome of the trial itself. This issue fails the second component of *Strickland*'s test for ineffective assistance. This issue is procedurally barred and wholly without merit.

¶47. Next, Simon alleges his trial counsel ineffectively assisted him because counsel failed to object (presumably by motion before the suppression hearing and later during trial) that Simon was not brought before a judge within a reasonable time. Again, the trial court's judgment as to the voluntariness of Simon's confession was affirmed by this Court. *Simon I*, 633 So. 2d at 412-13; *Simon II*, 688 So. 2d at 810. This Court rejected without elaboration Simon's claims in *Simon I* and *Simon II* that Simon's right to counsel, as discussed in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), was violated. Simon was detained for, at most, 46 hours. This is within the 48-hour time period where the burden of proving Simon's right to counsel was violated rested with Simon. There is evidence in the record of the necessity to move Simon from Coahoma County, where he was arrested, back to Quitman County so he could have his first appearance in a court in the county where the crime occurred. Also in the record is evidence that Simon's initial appearance had to be coordinated around the initial appearances of Anthony Carr and another suspect. Various news media had learned of the first appearances of the three murder suspects and crowded the courtroom that day. The excessive rains that weekend and the necessity of taking Simon to the hospital to perform a rape kit on his person and clothes–necessary for evidence relating to the murder of Charlotte–did not ease the transportation problems for the sheriffs that weekend. That Simon was interrogated during the time he awaited his initial appearance does not automatically give merit to his claim as the obstacles to bringing him there had to be overcome first.

¶48. Furthermore, there is little merit to the issue itself, as demonstrated by this Court's summary rejections in *Simon I* and *Simon II*. The time constraints under which Simon's trial counsel had to work also weigh against Simon here. Simon's trial counsel did not render deficient assistance by failing to specifically object to the length of the delay between his arrest and initial appearance. Simon's counsel put forth the best reasons for suppressing the confession to police–the alleged beatings by police, the lack of a knowing waiver of rights, and the psychological pressures of the interrogation–in an effort to have the confession ruled inadmissible. Counsel was capable of weighing the merits of the issue of the delay and judging its lack of evidentiary support. Simon does not demonstrate here how trial counsel was deficient by failing to raise in his suppression motions and object at trial to the delay in his initial appearance. This issue fails analysis under *Strickland*'s first component.

¶49. Assuming, once again, that counsel's performance was deficient, Simon cannot demonstrate how his trial was prejudiced by counsel's failure to object, because the trial court had previously ruled against him on that issue and this Court affirmed its judgment. As eloquently stated in *Williams v. State*, 722 So. 2d 447, 449 (Miss. 1998), "If the issue was without merit, then the failure to raise an objection cannot be considered ineffective assistance of counsel because no prejudice could result from such an omission." Simon does not attempt to show in the record what evidence adduced at trial should erode this Court's confidence in the correctness of the trial court's previous judgment. Therefore, the failure to object at trial to the delay in bringing Simon before a judge for his initial appearance did not prejudice the trial, nor the appellate consideration of the merits of the issue. This issue is without merit.

¶50. Finally, Simon alleges that during trial his counsel failed to adequately challenge the State's evidence in three areas: (1) counsel failed to contest officer Thomas's identification of one of the persons fleeing the truck as possibly fitting Simon's description and looking like Simon, (2) counsel failed to contest Simon's

connection to the apartment in Memphis which contained stolen goods used to prove the underlying felony of burglary, and (3) counsel failed to contest the issue whether the State had proven Simon broke into the Parkers' residence. The record does not support any of these alleged errors.

¶51. The first sub-issue concerns trial counsel's failure to contradict officer Thomas's testimony that the person leaving the Parkers' pickup and running by him "could have fitted Mr. Simon's description" and that he "could maybe possibly just say whom or what one of them [the men fleeing the truck] might have looked like." Simon alleges counsel did not adequately contest the change in testimony. On the contrary, once Simon's counsel realized that officer Thomas's testimony had improved in this trial over that given in the previous hearings and his testimony in *Simon I*, counsel confronted Thomas with the inconsistencies and vigorously cross-examined him about them, apparently with a copy of a transcript from a previous hearing or trial in his hands. His cross-examination comprises eleven pages, nine of which are spent on this one issue. There is no factual basis to support Simon's claim that his trial counsel did not adequately contest officer Thomas's identification of Simon fleeing the Parkers' truck and the issue is without merit.

¶52. The second sub-issue concerns Simon's allegation that his trial counsel failed to contest the proof offered by the State to connect Simon with the apartment in Memphis where some of the Parkers' property was recovered. The record reflects that it was Simon's wife who unlocked and opened the door to their Memphis apartment after signing a consent-to-search form. Three officers executing the search testified at trial that the apartment was Simon's residence. During this portion of each of their testimonies, trial counsel raised an objection. The first time, counsel extensively argued that the officer did not have a factual basis for his testimony that the apartment was Simon's. The objection was overruled as the State provided the necessary basis of knowledge. Even though counsel did not specifically state these grounds during the subsequent two objections, he asked for and received a continuing objection during the second officer's

testimony concerning the search, and merely objected during the third officer's testimony. The record does not support the allegation that the connection between Simon and the Memphis apartment was not adequately contested by Simon's trial counsel.

¶53. Later in his petition, Simon tries to show how the failure to adequately contest this connection resulted in the stolen goods found in the apartment–specifically Carl Parker's wedding ring–being admitted into evidence and used to prove the underlying felony of robbery. This he claims was deficient assistance of counsel because, without the goods found in Memphis, the State could not prove robbery without double counting the stolen goods found in the Parkers' pickup. Those goods were used by the State to prove burglary, the underlying felony in the murder of Bobbie Joe Parker. Since the evidence in the Memphis apartment was properly admitted at trial and since counsel contested the admission vigorously, it cannot be ineffective assistance for trial counsel to have failed to challenge the State's proof of robbery. The record shows that trial counsel adequately contested the evidence of the robbery and its admission into evidence.

¶54. The last sub-issue concerns Simon's allegation that his trial counsel did not contest the State's proof that Simon broke into the Parker residence, necessary to prove burglary. He takes issue with the fact that, although trial counsel moved for a directed verdict at the close of the State's proof–specifically alleging that the State failed to make a prima facie case–counsel did not renew that motion at the close of all proof. Simon cites **Holland v. State**, 656 So. 2d 1192, 1197-98 (Miss. 1995), for the proposition that the failure to renew a motion for a directed verdict at the close of all proof constitutes ineffective assistance of counsel. Simon overstates the **Holland** rule.

¶55. In **Holland**, this Court was concerned with the fact that trial counsel had completely failed to give the trial court the opportunity to review the sufficiency of the evidence at the end of the trial. Not only did

counsel fail to renew his motion for directed verdict at the close of all proof, he did not present the trial court with any post-trial motions which would have done the same (i.e. motion for judgment notwithstanding the verdict, request for a peremptory instruction, etc.). *Id.* at 1197.

¶56.    Simon's counsel did file post-trial motions which challenged the legal sufficiency of the evidence, namely a motion for a judgment notwithstanding the verdict or a new trial. Although this motion does not raise the specific issue of whether the State had proven the breaking into element of burglary, the trial court stated upon being presented with the motion for directed verdict:

> And also the death of Bobbie Joe Parker. The testimony was that she
> was shot, and there's ample evidence in this case of the crime of burglary
> of a dwelling house and the residence of the Carl Parker family.

The trial court denied the post-trial motion for judgment notwithstanding the verdict or for a new trial. It is clear that the trial judge considered the elements of burglary at the close of the State's presentation of evidence and at the end of trial and found the State's proof sufficient to support a verdict. Therefore, it was not ineffective assistance of counsel to fail to move the trial court for a directed verdict at the close of all proof or to fail to particularly stress the alleged lack of proof of one element in that motion or in post-trial motions.

¶57.    In summary, the questions of whether Simon's counsel was ineffective for failing to call his family to corroborate his claim that he was beaten by police, counsel was ineffective for failing to object by motion or at trial to the delay in Simon's initial appearance, and counsel's failure to challenge specific portions of the State's case are all without merit.

Jury Voir Dire: failure to challenge "for cause," failure to adequately question, and failure
to object

¶58. Simon alleges his trial counsel gave him ineffective assistance during voir dire because certain jurors who had been exposed to pretrial publicity were not struck "for cause." In his Petition and Amended Petition, Simon also alleges three deficiencies in trial counsel's voir dire examination of the venire concerning their views on the death penalty which caused him to render ineffective assistance of counsel: (1) counsel failed to object when his opportunity to rehabilitate jurors with beliefs against the death penalty was cut off, (2) counsel failed to raise this fact when the trial court stated that he had only partly rehabilitated those jurors, and (3) counsel failed to raise this fact when the State was given an additional opportunity for rehabilitation in response to the defendant's objections to jurors automatically in favor of the death penalty. Finally, Simon alleges ineffective assistance in his pro se petition and supporting memorandum because counsel failed to object when: (1) the trial court and District Attorney stated that the trial jury may be required to return a death sentence, (2) a statement made by the District Attorney constituted victim impact information, (3) the District Attorney improperly and erroneously defined reasonable doubt, (4) the District Attorney made a statement which minimized the presumption of innocence, (5) the District Attorney told the venire that a trial jury could reach a verdict either during or after the close of proof, (6) the District Attorney made statements which revealed his personal opinion of the merits of the case to the venire and invaded the province of the jury when he stated that a death sentence would not be an act of a "blood thirsty jury," and (7) the District Attorney told the jury the government has a right to a fair trial.

## A. Failure to challenge "for cause"

¶59. The sum of Simon's first allegation of ineffective assistance of counsel during jury voir dire is that counsel did not raise the point, during his motions to strike jurors "for cause" due to exposure to pretrial publicity, that the State had conceded that such jurors should be removed "for cause" after venue was transferred to DeSoto County. Four of those jurors in DeSoto County who had been exposed to the

25

pretrial publicity in the Simon case were seated on the jury after they intimated that they could set aside what they had heard. A fifth was seated as an alternate.

¶60.     In the record, the trial court is quoted summarizing a portion of the State's brief in opposition to Simon's motion to dismiss as follows:

> And, I believe you suggested in your brief that if we go to another county, and if we find any juror during voir dire that the pre-trial publicity had reached, that juror should be excused for cause. That's what your brief says.

This statement was made during a discussion on how to address the admitted prosecutorial misconduct and the misfiling and release of other evidence in contravention of a court order, court rules, and rules of professional conduct. The possibility of a change in venue was being debated, and the State was arguing that the venue change was the best way to address the problem of the pretrial publicity resulting from the mistakes. To put the statement in proper context, we quote the portion of the transcript which immediately follows the above statement:

> BY [The State]: Your Honor, of course–
>
> BY THE COURT:  –And, otherwise, so we may go to two or three counties.
>
> BY [The State]: Your Honor, if that juror when questioned on voir dire says that that juror has been contaminated with the virus and cannot lay aside anything that that juror may have heard or read, and has formed an opinion, well, certainly, that juror would have to be excused. And, if that juror–
>
> BY THE COURT: –That's the normal thing. What remedial measures do we have because of this, regardless of how it came about? I'm asking counsel for both sides. What is the remedy, because it is out, because all these things through these filings of these two responses, which should never have been.

It is a fair reading of the transcript that the State made such a concession during consideration of the motion to dismiss. From the context of the hearing, we find that the State was merely repeating the standard routinely applied by trial courts to motions to strike jurors "for cause."

¶61. The questioning during voir dire and the striking of jurors "for cause" is left to the sound discretion of the trial judge. *Caston v. State*, 823 So. 2d 473, 499-500 (Miss. 2002). Each of the jurors in question indicated that they could put aside any conclusions they had formed from their exposure to the publicity in this case and be fair and impartial during the trial. *Simon II*, 688 So. 2d at 804. They failed to meet the standard required to dismiss them "for cause." When each side was exercising peremptory challenges to members of the venire, Simon had a sufficient number of peremptory challenges left to exercise strikes on each of the jurors in question. He chose not to strike them. The decision not to use a peremptory strike on each of these jurors is a strategic one as there exists no grounds in the record to exclude them otherwise–the State's concession notwithstanding. Simon's counsel obviously found these jurors to be less offensive to his cause since he did not strike them peremptorily after moving to strike them "for cause." If Simon's trial counsel had reminded the trial court that the State had made this concession before the change in venue, it is possible the judge *might* have stricken the jurors "for cause." However, the trial judge was certainly not bound to enforce the State's concession. The record indicates the trial court used the appropriate standards when considering whether to strike prospective jurors "for cause." The fact that these particular jurors were ultimately seated without being peremptorily struck indicates they were satisfactory to Simon from a strategic standpoint.

¶62. Therefore, we conclude that the context of the concession by the State did not empower Simon's trial counsel to automatically exclude "for cause" all members of the venire exposed to pretrial publicity. Trial counsel was not deficient for failing to remind the trial judge of a non-binding and unenforceable

27

concession made by the State in the course of discussing options to remove the taint of pretrial publicity from the trial jurors. Counsel unsuccessfully moved to strike each of these jurors "for cause." Thus, counsel was not deficient for failing to remind the trial court of the State's concession during the time the court was striking jurors "for cause." Furthermore, assuming it was deficient performance to fail to remind the trial court of this, Simon's failure to strike them peremptorily indicates a non-prejudicial strategic decision was made to include them on the jury panel. Simon's argument here fails both of *Strickland*'s components, and the issue is without merit.

### B.  Failure to adequately question the members of the venire

¶63.    The second allegation of ineffective assistance during voir dire takes issue with the fact that Simon's trial counsel stopped individually questioning members of the venire about how they felt about the death penalty, yet did not object when the trial judge let the State rehabilitate certain members of the venire. The State, as noted above, argues that examination of this issue is barred by the doctrine of res judicata. We have disagreed because the issue is one of ineffective assistance and the jurors complained of on direct appeal differ from those submitted in this issue. The specific instance of stopping questioning came while Ms. Ethridge was answering trial counsel's question whether she could "follow the law and consider whether or not it's appropriate or not, even though you don't believe in it [the death penalty]. The State objected to this question's use of the word "consider," and objected when trial counsel tried to rephrase the question. According to the trial judge, the substance of the question had been asked three times previously. Simon complains that counsel should have continued to ask this question of the remaining members of the venire who had indicated their reluctance to impose the death penalty. Simon also complains that counsel should have brought this preemption of questioning to the trial court's attention after the court stated during motions to strike "for cause" that counsel had failed to rehabilitate those members

28

of the venire. Finally, Simon alleges ineffective assistance when trial counsel failed to object to the State's rehabilitation of other members of the venire during Simon's motions to strike jurors "for cause."

¶64.    It was not deficient assistance for Simon's trial counsel to have failed to object to the court's preemption of his questioning of these members of the venire with a line of questioning concerning the death penalty that had been explored in depth before. This ground had indeed been covered several times by the trial Court, the State, and Simon's trial counsel before the citations to the record Simon provides in his petitions. The jurors who were being questioned had already indicated they could not under any circumstances impose the death penalty. When first questioned by the trial court about her feelings, Ethridge stated unequivocally that she could not handle sentencing someone to death. The same is true of jurors Craigen, Dickerson, and Tinnel. When questioned again about their opposition to the death penalty, these same jurors, joined by Williams, indicated they could not impose the death penalty. Since the jurors in question were straightforward and unwavering in their opposition to imposing the death penalty, the judge did not err in cutting off Simon's trial counsel's last attempt to rehabilitate them, nor was counsel's assistance deficient for failing to object to this preemption.

¶65.    Simon's trial counsel did not render deficient assistance when he failed to bring up the fact that the trial court cut off his attempts to question certain jurors about the death penalty during the State's motions to strike jurors "for cause." Again, these jurors did not falter in their stated opposition to imposing the death penalty. There existed sufficient grounds to strike them for cause. The preemption had little, if any, effect upon the adequacy of their voir dire. The trial judge did not err in cutting off repetitive questioning by Simon's trial counsel of jurors concerning the death penalty. Thus counsel did not render deficient performance in failing to remind the judge that he had been cut off in his futile attempts to rehabilitate these jurors.

29

¶66.    Counsel was not deficient in failing to object to the State's rehabilitation of a few jurors when the defense was motioning the court to strike those jurors "for cause." The record reflects that during the time jurors were being stricken "for cause," where the judge's notes were inadequate, incomplete, or where he considered them untrustworthy, he would permit an individual voir dire of that juror to clear things up. No objections were made to this procedure by either party. It benefitted both sides. That Simon's trial counsel did not object to the judge's allowing individual voir dire of jurors–where the State was successful in clarifying the judge's perception of those jurors in a way that possibly could be characterized as favorable to the State–was not the provision of deficient assistance.

¶67.    Assuming, for argument's sake, that any one of these allegations were considered deficient assistance, or that all of these allegations taken together constitute deficient assistance, Simon cannot show prejudice. As noted above, each of the jurors Simon claims he should have had an opportunity to rehabilitate indicated unequivocally that they could not impose the death penalty if they were on the jury and Simon was found guilty. Therefore, sufficient grounds existed for them to be struck for cause and there is nothing in the record to indicate that their position softened or became more clarified by questioning from the trial court, the State, or the defense. These allegations fail both of the *Strickland* components, and the issue of whether Simon's trial counsel gave him ineffective assistance during voir dire is without merit.

### C. Failure to object to certain statements

¶68.    Finally, in Simon's pro se petition and supporting memorandum, he highlights various statements made by the trial judge and District Attorney that he claims to be inaccurate and prejudicial, and he alleges his counsel provided ineffective assistance for failing to object when those statements were made to the venire. Simon's first sub-issue here calls this Court's attention to the following statement the trial court made to the venire:

30

[T]hen I asked the question again, the same question I've attempted to ask you, if nevertheless those people who are opposed to the death penalty could still follow the instructions on the law and the testimony and the evidence justify a verdict of guilty, **if the law requires an imposition of a death penalty, if they could follow the law**, follow the instructions by the court **and impose the death penalty**, and one of those jurors stated that they could; the others stated that they could not. And that's basically the question the Court is asking each one of you. You're opposed to it, you have moral scruples against it, if you cannot impose it, automatically would not impose it, we would need to know that, but if you could follow the instructions on the law by this Court and shoulder those responsibilities and could consider the imposition of the death penalty in the weight and light of everything else, then we need to know that. [Defendant objects to form of the question]

(emphasis added). The District Attorney would later tell the venire, "under certain circumstances where the underlying felony is proved and where the facts and circumstances are proved, then there will be a sentence of death." The District Attorney elaborated further, "that where the law says that there is in certain circumstances death penalty [sic] . . . ." The State responds that these three statements are non-objectionable, counsel raised a timely objection, or counsel's failure to object did not result in ineffective assistance.

¶69.    The record reflects that Simon's counsel did object to the trial court's misstatement of the law immediately after he made it. This timely objection defeats this claim in this sub-issue because Simon cannot demonstrate how his trial counsel's performance was deficient. That counsel waited until the trial court finished phrasing its question demonstrates patience, not a failure to timely object. Furthermore, the trial court's statement was not objectionable, and Simon cannot show how the failure to object prejudiced his case with respect to the court's statement. The record clearly indicates the intent of the court's question was to determine whether juror Ethridge, and the members of the venire like her, could even consider imposing the death sentence under appropriate circumstances. The court was not instructing the members

31

of the venire that in certain cases the law required a death sentence. Simon cannot show how this delay in objecting prejudiced his trial and sentencing because the venire was correctly told several times during voir dire by attorneys for both sides about their liberty in electing a sentence.

¶70. The District Attorney's statements are likewise unobjectionable, therefore, counsel's failure to object to them was not deficient performance nor can Simon show how this failure prejudiced his trial and sentencing. The District Attorney's statements alerted the potential jurors to the State's intention to seek the death penalty, and informed them they might be called upon to consider the death penalty upon a finding of guilt. This presented other members of the venire, harboring objections to the death penalty and unable to follow the law, with an opportunity to express their reservations. The District Attorney concluded the colloquy containing the above mentioned statements by asking:

> In the event the jury finds guilt, we will ask for the jury to impose a sentence of death in this case based on the facts of this case. We need to tell you that and you need to know it. Now, some of you have already raised your hands and you've said, "No, I could not under any circumstances vote for death." You've already done that, and we understand that. Is there anybody else now having heard what I just said, and it's real because if you vote for guilt, you go into the sentencing phase, the second phase, and that is where you vote for the penalty. Is there anybody who could not follow the law if the facts justify the death sentence, simply could not do it? Now, raise your hand if there's somebody else other than those who have already indicated.

Simon's trial counsel did not perform his duties deficiently when he did not object to the above mentioned quotes because they are a small part of an unobjectionable larger colloquy and question which sought information from the venire necessary to determine if certain jurors could be struck "for cause." Furthermore, as noted above, the members of the venire were correctly informed during voir dire of their freedom to elect a sentence of their choosing.

¶71. The next statement Simon takes issue with was made by the District Attorney when explaining the difference between murder and capital murder:

> I have already said what makes a capital murder case and that is where you have an underlying felony, it's not–and the shame is this, that we have now started referring to other murders as simple murders, and that's a shame.

Simon claims this is the equivalent of objectionable victim impact information presented to the venire at an impermissible time. The State characterizes this claim as "somewhere off in left field," and asserts that this is not victim impact information and Simon has not shown deficient performance nor prejudice.

¶72. We agree with the State. The statement in question is merely one made during an attempt to distinguish between two types of murder defined in our statutes. That the District Attorney called the colloquial reference to one "a shame" is not victim impact information nor did it prejudice Simon's trial and sentencing. The comment is too vague to justify correlation to facts of the instant case, and it was not a comment upon the sufficiency or weight of the evidence yet to be presented. Therefore, it was not ineffective assistance for Simon's counsel to have failed to object to this statement made by the District Attorney. The District Attorney's editorial statement should not be condoned, but reversible error does not lie here.

¶73. The next statements Simon complains about were made by the District Attorney when attempting to establish the boundaries of the State's burden of proof. Some examples include:

> . . . we do not have to prove beyond an absolute certainty. Do you understand that a case would be impossible to prove if we did that?

> . . . do you agree that you could be reasonable and would not require the State to do the impossible, that is to put you at the scene and back you up in time and show you all that? Will you agree to be reasonable?

> Will you agree to be reasonable, nod if that's true?

33

The State counters that these statements are not objectionable, and cites cases where this Court has examined similar questioning and found such to be unobjectionable so long as reasonable doubt is not defined when the trial court instructs the jury. *See Griffin v. State*, 504 So. 2d 186, 192-93 (Miss. 1987); *Bingham v. State*, 434 So. 2d 220, 225 (Miss. 1983).

¶74. Again, we agree with the State. The jury was not instructed by the trial court as to any definition of reasonable doubt. The statements were made during voir dire, yet this Court has found such statements unobjectionable as late as closing arguments so long as reasonable doubt is not defined by the trial court. *See, e.g., Christmas v. State*, 700 So. 2d 262, 269 (Miss. 1997). Since the jury was appropriately instructed, Simon cannot demonstrate either how his trial counsel was deficient for failing to object to these statements or how this failure prejudiced his trial and sentencing. Therefore, we find counsel did not render ineffective assistance for failing to object to these statements.

¶75. Next, Simon complains his trial counsel failed to object when the District Attorney allegedly "minimized" the State's burden of proof. For instance, the District Attorney likened the presumption to a block of ice which melts during trial until the State has met the burden of proving the defendant guilty. Simon asserts that the statements are improper and legally erroneous. The State replies that Simon is incorrect, and the District Attorney's statements were correct statements of the law. We agree with the State. Related to this issue is Simon's claim that his trial counsel was ineffective because he failed to object to the District Attorney's block of ice metaphor as it allegedly instructs the jury that they may deliberate prior to the conclusion of the presentation of evidence. The State responds that the District Attorney's statements did not instruct the jury to begin its deliberations before the conclusion of evidence, and the jury was ultimately instructed by the trial court as to when they should deliberate. Again, we agree with the State.

¶76. The burden of proof the State must meet to convict a defendant never shifts to the defendant, yet it may be met during the course of the trial. ***Carr v. State***, 192 Miss. 152, 4 So. 2d 887, 888-89 (1941). The concept that a juror may be convinced of guilt during trial is distinct from the principle that the jurors will not discuss among themselves the sufficiency and weight of the evidence of guilt until the case has been submitted to them for their consideration. Where the latter principle is not followed, there exists grounds for reversal. *See, e.g.,* ***Holland v. State***, 587 So. 2d 848 (Miss. 1991) (where a jury deliberated and sentenced a defendant to death before being instructed to do so). The District Attorney's use of the block of ice metaphor during voir dire was not objectionable because the whole of his question accurately states the law. He did not misstate the law when he indicated the State's burden of proof could be met before the end of the presentation of evidence, nor did he encourage the jury to deliberate before the time proscribed by law. The jurors were properly instructed not to deliberate until the close of trial and encouraged to withhold their personal judgment until Simon had presented his case. Therefore, we find that Simon's counsel was not deficient for failing to object to statements which accurately describe the law. Furthermore, Simon cannot demonstrate how these comments prejudiced his case because the trial court informed the jury that it was the source of the law and the jury was to follow its instruction, treating the comments by the District Attorney and defense counsel as persuasive but not binding. There is no indication in the record that the jury did not do as instructed, either failing to consider all the evidence or deliberating before the proper time.

¶77. Next, Simon complains that his counsel was deficient for failing to object when the District Attorney told the venire that it would not be "blood thirsty" if the trial jury imposed the death penalty. Simon argues this comment was inappropriate and unconstitutional because no evidence had been presented, his trial counsel had not even questioned the jury yet, and it diminished the personal responsibility of the jury. The

35

State counters that the statement is not objectionable and the trial judge later instructed the trial jury that the death penalty was to be a product of their individual decisions and the statements made by the attorneys are not instructions of law.

¶78. We do not condone the District Attorney's statement nor are we of the opinion that it is proper during jury voir dire. However, these were statements made to a large group of potential trial jurors, only a few of whom would later be sworn in and instructed by the trial court that statements made by the attorneys are meant to be persuasive. The decision not to object at this early stage is a product of trial strategy, and thus no merit lies in the claim of deficient performance. Simon has not shown that some members of the venire wound up on the trial jury and second-guessed their decision to possibly sentence him to life due to the District Attorney's statement. There are no affidavits from affected trial jurors in support of this conclusion in the record now. Therefore, Simon has failed to meet his burden, and this sub-issue is without merit.

¶79. Simon's final claim concerning statements made during voir dire concern the District Attorney telling the jury that the State is entitled to a fair trial just like the defendant. Simon claims the State is not entitled to a fair trial. The State counters that the statement is not objectionable and the case cited by Simon in support of his argument does not apply. We agree with the State's argument.

¶80. Simon cites *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 510, 109 S.Ct. 1981, 1985, 104 L.Ed.2d 557 (1989), for the proposition that the Sixth Amendment guarantees a criminal defendant fair trial rights not enjoyed by the State. The text of the opinion does indeed state this, but *Green* is about the cross-examination limits of a defense witness in a civil case. The Supreme Court was comparing the rights of a criminal defendant to those of a civil defendant when impeaching a witness called by the State or plaintiff. The case does not address whether the State is entitled to a fair trial. It allows a

36

civil plaintiff the equal right to cross-examine a witness for the defense about prior felony convictions or convictions involving dishonesty or giving a false statement that a defendant in a civil case enjoyed. This case is not on point nor is it persuasive in this context.

¶81.    What remains is Simon's allegation that the District Attorney incorrectly stated the law. While we agree that Simon enjoyed procedural protections the State did not enjoy during his trial, the State still gets its opportunity to produce evidence against him in court subject to those protections. Simon's counsel was not deficient for failing to object to this statement because the statement was an attempt by the State to determine if it could pick a jury that would hear the evidence it presents with an objective mind. Furthermore, Simon has not shown prejudice because he has not produced affidavits from trial jurors nor shown evidence in the record which indicates that this statement affected their judgment in any way. This sub-issue is without merit.

Cumulative errors warrant reversal

¶82.    Simon argues that the standard this Court employs must consider prejudice from counsel's errors as a whole, not item-by-item, when determining if the errors warrant reversal. At this stage in the proceedings, it is not necessary to determine and apply the ultimate standard for ineffective assistance. All that needs to be answered presently is whether it appears likely that Simon will prevail upon his claims of ineffective assistance if this case were sent down to the trial court for a hearing. Since we have found that he will not and his trial counsel did not commit error, the point whether Simon's counsel's errors cumulatively provided ineffective assistance is moot.

II.    WHETHER THE STATE VIOLATED THE DISCLOSURE RULE ANNOUNCED IN *BRADY v. MARYLAND* BY FAILING TO PROVIDE SIMON A COPY OF THE TRANSCRIPT OF OFFICER THOMAS'S TESTIMONY IN THE CARR TRIAL.

37

¶83. In this issue, Simon alleges the State violated the disclosure rule pertaining to exculpatory evidence announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it failed to provide him with a copy of the transcript of officer Thomas's testimony from the *Carr* trial. In that trial, it appears that officer Thomas did not provide testimony quite as damning as he did in *Simon II*. We have found that review of this issue is procedurally barred. Considered on its merits, Simon cannot demonstrate how a hearing below would entitle him to any relief because it is doubtful whether this even qualifies as a *Brady* violation and, assuming it is, it had no effect on the outcome of his trial. We will now briefly discuss *Brady* and its application here.

¶84. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196-97. Before *Simon II*, Simon filed a discovery request for any witness statement that were written down. Officer Thomas's statement during the Carr trial, occurring hardly one month prior to the trial in *Simon II*, was not likely transcribed at the time of that trial. Assuming it was, it was not exactly favorable or unknown to Simon. Simon is a black male and meets the description officer Thomas provided of the two subjects fleeing the Parkers' pickup in the *Simon I* and *Carr* trials. *Simon I*, 633 So. 2d at 408, *Carr*, 655 So. 2d at 831. Thomas's prior statement is hardly exculpatory.

¶85. The testimony in *Simon II* that officer Thomas "could maybe possibly just say whom or what one of them [the men fleeing the truck] might have looked like" and the individual "looked like Simon" tends to inculpate Simon more than officer Thomas's testimony in the two previous trials. While this fact could be used by Simon to impeach Thomas in *Simon II*, it was hardly a secret that his testimony had changed.

38

A vigorous impeachment on cross-examination, as noted above, was exactly the outcome of officer Thomas's improved testimony in *Simon II*. From the record, it is clear that Simon either possessed the *Carr* trial transcript or a transcript from *Simon I* or any of the many hearings jointly held between the two. Under these circumstances, we find it doubtful that a *Brady* violation actually occurred. However, since we cannot state with absolute certainty that Simon's trial counsel did not have a copy of officer Thomas's testimony in the *Carr* trial, it will be assumed for the sake of argument that such has occurred. This error did not affect the outcome of *Simon II*.

¶86. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Once Simon's defense counsel realized that officer Thomas's testimony in *Simon II* had improved over that in a prior hearing, he began cross-examining him with the vagueness of his prior statements from a hearing. This went on for quite some time, and the point was effectively made that officer Thomas may have embellished his testimony. Simon cannot show this supposed *Brady* violation to have affected the outcome of his case. Had his counsel possessed the *Carr* transcript during cross-examination of Thomas in *Simon II*, he would have done exactly the same thing as he did. Since Simon cannot show how this would have altered the outcome of *Simon II*, a hearing on this matter is pointless as any *Brady* violation proves to be harmless. Therefore, we conclude that Simon is not likely to prevail if he is given a hearing on this matter and deny his request for relief.

### III. WHETHER THE IMPOSITION OF THE DEATH PENALTY IN THIS CASE VIOLATES DOUBLE JEOPARDY.

39

¶87.    In this issue, Simon argues that his death sentence for the murders of Carl, Bobbie Joe, and Gregory Parker is barred by the double jeopardy clause of the Fifth Amendment to the United States Constitution because he was sentenced to life imprisonment for the murder of Charlotte Parker.  He cites *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), in support of his contention.  It is Simon's position that the jury's inability to unanimously agree to impose the death penalty in Simon's trial for the murder of Charlotte Parker is an acquittal of the death penalty and "is in no sense a 'hung jury.'"  We have previously found this issue to be barred from review by the doctrine of res judicata.  We agree with the State that *Bullington* and *Ashe* are substantially distinguishable from the facts in the instant case.

¶88.    *Bullington* involved a defendant who was sentenced to 50 years to life imprisonment  by a unanimous jury after being found guilty of murder.  451 U.S. at 435-36, 101 S.Ct. at 1856.  Once the guilty verdict was overturned, the United States Supreme Court held that Bullington could not be sentenced to death upon retrial because the first jury had unanimously sentenced him a lesser sentence. *Id.* at 444-46, 101 S.Ct. at 1861-62.  In *Ashe*, a defendant was indicted for multiple murders which occurred during one brief armed robbery of a poker game.  397 U.S. at 437-40, 90 S.Ct. at 1191-92.  He was tried separately for each murder.  He was found "not guilty" during the guilt phase of his first trial, but was found "guilty" in a subsequent trial involving a different victim. *Id.*  The same evidence was presented in the second trial as the first, but a few witnesses called in the first trial improved their testimony for the State in the second, and the State did not call a witness who had, at the first trial, failed to identify the defendant as a participant. *Id.*  The Supreme Court held that once the defendant had been found not guilty for the first murder, he

could not be tried for any of the other murders during the armed robbery where the evidence was the same and a jury had previously acquitted him. *Id.* at 446-47, 90 S.Ct. at 1195-96.

¶89.    The facts of the instant case are not guided directly by either case. Simon's first conviction was not reversed by this Court, nor was the jury unanimous in sentencing him to life imprisonment. Instead, the judge sentenced Simon to life because the jury was deadlocked on the matter. The jury's inability to unanimously agree on a sentence in no way "acquitted" Simon of the death penalty. What the U.S. Supreme Court found compelling in *Bullington* was the similarities between the guilt and sentencing phases of trial in a capital murder prosecution under a bifurcated procedure similar to the one employed in Mississippi courtrooms. Because sentencing was effectively a trial on the merits of the appropriateness of the death penalty, a unanimous jury's sentence would have the same effect on future prosecutions seeking the death penalty as an unanimous jury's acquittal during the guilt phase of trial on any future prosecution for the same crime. However, in the instant case, the State is not reprosecuting Simon for the murder of Charlotte Parker, but trying him for the separate and distinct murders of Carl, Bobbie Joe, and Gregory. In these respects, this case is more similar to the situation addressed in *Rodden v. Delo*, 143 F.3d 441 (8th Cir. 1998). The discussion of double jeopardy in this case guides this Court.

¶90.    The defendant in *Rodden* was charged with a double murder. He was tried separately for each murder and convicted of both murders. *Id.* at 443-44. Similar to the instant case, the defendant was sentenced to life imprisonment for the murder tried in the first trial and sentenced to death for the other murder tried in the second trial. On appeal of the second verdict, he alleged that collateral estoppel prevented the second jury from relitigating the issue of capital punishment, using the *Ashe* and *Bullington* opinions as authority. *Id.* at 444. The Eighth Circuit found no merit to this argument, stating:

41

The Double Jeopardy Clause protects against multiple punishments for the same offense, *see Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 2525-26, 105 L.Ed.2d 322 (1989), but does not prevent a state from selecting independent penalties for separate crimes, *see Kokoraleis v. Gilmore*, 131 F.3d 692, 695 (7th Cir.1997). "Each additional crime creates a fresh exposure to punishment, which may be cumulative--indeed, *must* be cumulative if there is to be deterrence for extra offenses." *Id.* Thus, a serial killer may be sentenced to death for killing someone after being sentenced to life imprisonment for killing someone else in a separate incident. *See id.* Similarly, a killer who murders two people at the same time may be tried separately for the two distinct murders and sentenced separately for each murder. *See Therrien v. Vose*, 782 F.2d 1, 5 (1st Cir.1986); *Miller v. Turner* 658 F.2d 348, 350-51 (5th Cir.1981); *see also Ciucci v. Illinois*, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983 (1958) (per curiam) (when a killer murders several people in the same incident, a state may separately prosecute the killer for the murder of each victim).

143 F.3d at 444.

¶91.    Mississippi law concerning multiple murders committed contemporaneously treats each act as a separate offense. *Clemons v. State*, 482 So. 2d 1102, 1106 (Miss. 1985). *See also Wilcher v. State*, 455 So. 2d 727 (Miss. 1984); *Wilcher v. State*, 448 So. 2d 927 (Miss. 1984). The facts developed at Simon's trials differed. In *Simon I*, the State was required to prove rape as the underlying felony. In *Simon II*, the State was required to prove that Gregory was effectively kidnaped when he was bound hand and foot, Carl was robbed when his wedding ring was taken off his amputated finger, and Bobbie Joe's home was burglarized when Simon and Carr broke into the Parkers' residence with the intent of committing a felony. The State was not required to prove how Carl, Bobbie Joe, and Gregory died in *Simon I*, nor were they required to prove how Charlotte died in *Simon II*. While the presentation of certain evidence was duplicated from *Simon I* in *Simon II*, the elements of each murder required proof sufficiently different from one another to distinguish each count of murder and its individual heinousness

when determining whether double jeopardy attached for sentencing purposes. Therefore, the evidence presented by the State in *Simon I* was sufficiently different from the proof presented in *Simon II* to prove each element of the murders of Carl, Bobbie Joe, and Gregory that the U.S. Supreme Court's holding in *Ashe* is not violated.

¶92.     This Court has examined this issue previously without citing *Bullington* in *Otis v. State*, 418 So. 2d 65, 66-67 (Miss. 1982). This Court found in *Otis* that former jeopardy and collateral estoppel do not apply in instances where one defendant has multiple trials for murders occurring in close temporal proximity. *Id.* at 67. In keeping with our precedent, we conclude that the issue is without merit and procedurally barred.

## CONCLUSION

¶93.     The following claims from Simon's petitions for post-conviction relief are denied as procedurally barred: (1) the claim that double jeopardy is violated by the death sentences in this case; (2) ineffective assistance of counsel claims relating to the failure to offer corroborating evidence of police brutality and the failure to challenge the admissibility of Simon's confession due to the delay in his initial appearance; (3) the claims previously raised on direct appeal concerning the denial of counsel during Simon's interrogation before his first appearance, the change in venue and resulting racial makeup of the jury, the admission of Simon's confession at trial, and the *Batson* violation; and (4) the claims not raised on direct appeal which do not relate to ineffective assistance of counsel and were not preserved by an objection. The arguments which cite no supporting authority are also procedurally barred, unpersuasive and summarily rejected. When examined in the alternative to imposing a procedural bar, we find the double jeopardy claim and the two ineffective assistance of counsel claims to be without merit. The remaining claims of ineffective assistance of counsel are without merit as no claim passes both elements of the *Strickland* test for

43

ineffective assistance of counsel, and it does not appear likely that Simon could prove such should he be afforded a hearing before the trial court. Simon's claim that a *Brady* violation occurred is also rejected on its merits. Therefore, we deny Simon leave to file his petitions for post-conviction relief.

¶94. **PETITIONS FOR LEAVE TO SEEK POST-CONVICTION RELIEF, DENIED.**

**McRAE AND SMITH, P.JJ., WALLER, COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**