# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 9, 2009

Charles R. Fulbruge III
Clerk

No. 08-70011

ROBERT SIMON, JR

Petitioner-Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:04-cv-26

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Robert Simon, Jr. was convicted and sentenced to death for the murders of Carl and Bobbie Joe Parker and their son Gregory Parker. The district court denied Simon's federal habeas petition, and he now seeks a Certificate of Appealability ("COA") on several ineffective-assistance-of-counsel claims. Specifically, Simon claims that his counsel was ineffective in (1) failing to investigate his history of familial abuse and present that history as mitigation

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

evidence at sentencing, (2) failing to offer witnesses to corroborate his contention that his confession was physically coerced, (3) failing to use extra for-cause challenges at jury selection, and (4) failing to rehabilitate jurors who refused to impose the death penalty.

We grant a COA on Simon's first claim. The Supreme Court of Mississippi held that Simon's trial counsel was not ineffective for failing to investigate Simon's history of familial abuse because there was no evidence that counsel knew or should have known that such abuse took place. According to that court, counsel could not be ineffective absent some reason to investigate Simon's history of abuse. As detailed below, we find it debatable whether the Supreme Court of Mississippi's decision was an objectively reasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

As to Simon's remaining claims, we deny a COA because the district court's resolution of these claims is not debatable among jurists of reason. We therefore grant in part and deny in part Simon's petition for a COA.

## I. BACKGROUND

The parties are familiar with the background of this case, and we will only briefly review the relevant facts. Carl and Bobbie Joe Parker lived in Quitman County, Mississippi with their children, Charlotte and Gregory Parker. On February 2, 1990, a passing motorist saw that the Parkers' house was on fire. After the fire was extinguished, the bodies of all four family members were found inside the home. Carl, Bobbie Joe, and Gregory had all died of gunshot wounds. Charlotte, though shot three times, died of smoke inhalation. Simon and another man, Anthony Carr, were soon arrested and charged with the Parkers' murder.

In June 1990, the State tried Simon for the capital murder of only Charlotte Parker, a case that we refer to as *Simon I.* The jury found Simon

guilty but could not reach a unanimous decision on his sentence. The trial court therefore sentenced Simon to life imprisonment for Charlotte Parker's murder.

After *Simon I*, the State tried Carr for the capital murder of all four Parkers. A jury convicted Carr on all four counts and returned a sentence of death on each count.

Finally came Simon's second trial, the one from which the present proceedings arise. In October 1990, the State tried Simon for the capital murders of Carl Parker, Bobbie Joe Parker, and Gregory Parker, a case that we refer to as *Simon II*. A jury found Simon guilty on all three counts and returned a sentence of death on each count. The Supreme Court of Mississippi later affirmed Simon's conviction and sentence. *See Simon v. State (Simon II, Direct Appeal)*, 688 So. 2d 791 (Miss.), *cert. denied*, 521 U.S. 1126 (1997).

Simon later filed a pro se petition for habeas relief in the Supreme Court of Mississippi. *See Simon v. State (Simon II, State Habeas)*, 857 So. 2d 668 (Miss. 2003). The court denied Simon's petition, and he then filed a federal habeas petition in the Northern District of Mississippi. *See Simon v. Epps (Simon II, Federal Habeas)*, No. 2:04-cv-26, 2007 WL 4292498 (N.D. Miss. Nov. 30, 2007). The district court denied relief on all of Simon's claims and later denied a COA to this court. *See Simon v. Epps (Simon II, Denial of COA)*, No. 2:04-cv-26, 2008 WL 762182 (N.D. Miss. Mar. 19, 2008). Simon now appeals that denial of a COA.

## II. STANDARD OF REVIEW

To obtain habeas relief under 28 U.S.C. § 2254, Simon must show the Supreme Court of Mississippi's resolution of his claims was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). But before we have jurisdiction to rule on the merits of his appeal, Simon must obtain a COA by

making "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (alteration and quotation marks omitted). "A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part." *Id.* at 338 (quotation marks omitted). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quotation marks omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* Finally, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original, quotation marks omitted).

## III.  DISCUSSION

Although he presents them as three arguments, Simon essentially raises four claims of ineffective assistance of counsel.  He primarily contends that his trial counsel failed to adequately investigate his history of familial abuse and thus did not present a proper case for mitigation at sentencing.  Second, Simon contends that his trial counsel was ineffective in failing to corroborate his claims that his confession was physically coerced.  Third, Simon contends that his trial counsel failed to use extra for-cause challenges to strike biased jurors.  Finally, Simon asserts that his counsel failed to adequately rehabilitate jurors who had refused to impose the death penalty.

All of Simon's claims are governed by *Strickland*'s two-part standard for

4

ineffective assistance. *See Strickland*, 466 U.S. at 687. Under this standard, Simon must show (1) that his counsel's performance was deficient, and (2) that this deficient performance prejudiced him. *Id.* For counsel's performance to be deficient, he or she must commit "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* We judge counsel's performance against "an objective standard of reasonableness." *Id.* at 688. There are no strict guidelines for making this determination; what constitutes deficient performance is fluid and evolving, and we must measure counsel's performance against the "prevailing professional norms" of legal practice. *Id.*; *see also Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005). Indeed, the Supreme Court has emphasized that there are no "mechanical rules" when addressing a claim of ineffective assistance:

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Strickland*, 466 U.S. at 696. In making this determination, we must consider all relevant circumstances, including, for example, practice guides from the American Bar Association. *Id.* at 688; *see, e.g.*, AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989). Still, no single set of rules can definitively determine the sufficiency of counsel's performance. *Strickland*, 466 U.S. at 688–89. And importantly, our assessment of counsel's performance is "highly deferential." *Id.* at 689. We must avoid the biasing effect of hindsight, and we therefore entertain a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy." *Id.* (quotation marks omitted).

As to *Strickland*'s second requirement, for counsel's deficient performance to prejudice a defendant, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Under *Strickland*'s prejudice requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Finally, when a petitioner cannot satisfy one component of *Strickland*, there is no need to assess the other. *Id.* at 697, 700.

## A. Failure to Investigate

Simon first argues that his trial counsel rendered ineffective assistance during the sentencing phase of his trial. Simon asserts that his counsel failed to conduct an investigation into his background, wherein counsel would have found a history of abuse at the hands of Simon's father. According to Simon, his counsel's failure to uncover this history of abuse resulted in the presentation of a woefully weak case for mitigation. Simon further contends that, if the jury had heard of his history of abuse, there is a reasonable probability that it would not have sentenced him to death.

The Supreme Court of Mississippi denied Simon's claim on this point. According to that court, it was reasonable for counsel not to investigate Simon's history of abuse because Simon had not told his counsel of this abuse. In the court's words,

> [W]e do not find that trial counsel's conduct fell below the ordinary standard of assistance of counsel because he did not inquire—without prompting—into the possibility of abuse of his client as a child. . . . Simon has failed to show in the record and in his affidavits that his counsel knew or had reason to know of his past abuse given his and [the defense psychologist's] investigation.

6

*Simon II (State Habeas)*, 857 So. 2d at 685. According to the court, because there was no evidence that Simon's trial counsel had any reason to investigate Simon's past, he could not be ineffective for failing to do so. *Id.* The court also held, alternatively, that Simon could not show prejudice on this claim. *Id.* According to the court, "[e]vidence of Simon's abuse as a child . . . would not have had a reasonable probability of changing the jury's sentence from death to life had it been presented to them." *Id.*

The district court agreed with the Supreme Court of Mississippi. According to the district court, "[t]he fact that counsel did not uncover or present evidence of an abusive family history is not indicative of a lack of trial preparation where counsel was given no information that would suggest such abuse had been present." *Simon II (Federal Habeas)*, 2007 WL 4292498, at *19. The district court also held that Simon failed to show that the Supreme Court of Mississippi had erred in its determination that counsel's purported failings prejudiced him. *Id.*

We find the district court's resolution of this claim debatable, and we therefore grant a COA. At issue is counsel's duty to investigate a capital defendant's history of abuse in preparing a case for mitigation at sentencing. Like any claim of ineffective assistance, we must assess the reasonableness of counsel's investigation in light of all relevant circumstances. One relevant circumstance, of course, is the information that the defendant has provided his or her trial counsel. As the Supreme Court noted in *Strickland*, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions":

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For

7

example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

466 U.S. at 691.

That being said, the information the defendant provides to counsel is not dispositive, and *Strickland* did not create a *per se* rule that counsel's duty to investigate begins and ends with information gleaned from the defendant him- or herself. Indeed, such a bright-line rule would be inimical to *Strickland*'s mandate of case-by-case consideration. Instead, counsel's decision to investigate, like all others, must be reasonable in light of *all* the relevant circumstances:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690–91; *see also Rompilla*, 545 U.S. at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.").

Along these lines, several post-*Strickland* decisions from the Supreme Court make clear that counsel's decision to cease investigating a capital

defendant's past—or even not to investigate it at all—must be informed and reasonable. *See, e.g.*, *Rompilla*, 545 U.S. 374; *Williams v. Taylor*, 529 U.S. 362 (2000). Of particular relevance is *Wiggins v. Smith*, 539 U.S. 510 (2003), in which the Court spoke at length of how we should evaluate counsel's decision regarding an investigation into mitigating evidence. In *Wiggins*, a capital defendant's trial counsel did not investigate the defendant's life history or family background—which, it turns out, included a substantial history of abuse—and therefore presented no evidence of abuse at sentencing. *Id.* at 516. In an opinion by Justice O'Connor, the Court held that counsel's assistance was ineffective, as there was no reason or justification for counsel's failure to look into the defendant's past. The Court emphasized that the pertinent question was "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background *was itself reasonable*." *Id.* at 523. Thus, the fact that counsel acquires *some* information does not necessarily render counsel effective. *Id.* at 527. Instead, counsel must have sufficient information from which they could make a reasoned strategic decision not to pursue additional evidence of abuse:

> In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel in *Wiggins*] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

*Id.* In other words, courts must determine whether "the decision to cease all investigation . . . actually demonstrated reasonable professional judgment." *Id.*

The *Wiggins* Court made clear that counsel is not required "to investigate every conceivable line of mitigating evidence no matter how unlikely the effort

would be to assist the defendant at sentencing." *Id.* at 533. It also noted that *Strickland* does not require "defense counsel to present mitigating evidence at sentencing in every case." *Id.* But, as the Court had previously stated in *Strickland*, "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation. A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (citations and quotation marks omitted).

As to the trial counsel in *Wiggins*, the Court found that their investigation was not reasonable, as the defendant's "counsel abandoned their investigation of [the defendant's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. Moreover, counsel's limited investigation revealed leads that any competent attorney would have pursued, as doing so "was necessary to making an informed choice among possible defenses." *Id.* at 525. Indeed, counsel in *Wiggins* found no evidence that a mitigation case would have been counterproductive, such that they had no reason to *cease* their investigation. *Id.* In brief, counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526.

In the present case, the actual contours of Simon's trial counsel's investigation into his history of familial abuse is unclear. In his petition to the Supreme Court of Mississippi, Simon attached several statements from family members who relayed stories of abuse and said that Simon's counsel never contacted them. The Supreme Court of Mississippi did not order an evidentiary hearing on the matter. Instead, taking the statements of Simon's family as true, the court held that Simon's trial counsel was not ineffective because there was no evidence "that Simon's trial counsel was ever told before or during the

sentencing phase of trial that Simon was abused as a child." *Simon II (State Habeas)*, 857 So. 2d at 685. In so doing, the Supreme Court of Mississippi's decision might suggest that even if Simon's trial counsel made *no* investigation into Simon's history of abuse, the decision to do so was justified because there was no evidence that counsel was aware of such a history. We conclude that the question of whether the Supreme Court of Mississippi reasonably applied *Strickland*'s deficient-performance prong is debatable among jurists of reason.

As to prejudice, the Supreme Court of Mississippi held that any evidence of familial abuse—even if further developed at an evidentiary hearing—would not have had a reasonable probability of altering the jury's sentence when considered against the heinousness of the crimes. *See Simon II (State Habeas)*, 857 So. 2d at 685. But because Simon's trial counsel presented no evidence of abuse at sentencing, we conclude that it is debatable among jurists of reason whether there is a reasonable probability that the development and presentation of Simon's history of abuse would have influenced the jury's appraisal of Simon's moral culpability. *Cf. Wiggins*, 539 U.S. at 537–38.

Without passing judgment on the Supreme Court of Mississippi's decision, we think that jurists of reason can debate the merits of Simon's claim on this point. We therefore grant a COA on Simon's claim of ineffective assistance at sentencing. We also request additional briefing on this claim and have included detailed instructions in the Conclusion.

## B. Failure to Develop Evidence of Physical Coercion

Simon next argues that his counsel was ineffective in failing to offer witnesses to corroborate his assertion that the police physically coerced his confession. Simon confessed to the Parkers' murders shortly after his arrest. Before the trial in *Simon I*, he moved to suppress the confession as coerced. At the suppression hearing, Simon's trial counsel focused primarily on the

argument that the confession was *psychologically*, not *physically*, coerced. The only evidence of physical coercion at the suppression hearing came from Simon's own testimony and a brief remark from another witness. The suppression motion was ultimately unsuccessful. Later, during the *Simon II* trial, Simon's trial counsel did not argue that the confession was physically coerced, again focusing on psychological coercion.

Simon now contends that his trial counsel was ineffective because counsel failed to offer the testimony of three witnesses—his mother, wife, and brother—who would have corroborated Simon's claim of physical coercion. In three documents attached to his petition for federal habeas, Simon's brother, mother, and wife all assert that they visited Simon a "couple" of weeks after his confession. These witnesses allege that Simon displayed visible signs of abuse and had said that police had beaten him. Aaron Simon, Simon's brother, stated that Simon's "face was bruised and swollen." Moreover, Simon told Aaron "that law enforcement had jumped on him and beaten him up." Finally, Aaron asserted that he saw Simon shortly before his arrest and, at that time, Simon showed none of the injuries that Aaron later saw.

Rosie Lee Simon, Simon's mother, stated that Simon's "head was very swollen from having been beaten. His left eye was bruised, his hand was shaking, and he said 'They beat me up so bad.'" Rosie Lee noted that she is a trained CNA and thus knows how to recognize signs of abuse. She also alleges that she told Simon's trial counsel of his injuries.

Martha Simon, Simon's wife, said in an unsigned statement that Simon "had been badly beaten." In her words,

> His head and face were swollen and I saw he was limping badly. He said the police had beaten him up. It was pitiful. His eyes and mouth were all swollen. I had a hard time understanding because his mouth was so swollen. I didn't recognize him when I first saw

him.

Like Rosie Lee Simon, Martha Simon stated that she was trained to recognize signs of abuse.

In addressing this issue, the Supreme Court of Mississippi held that Simon had established neither deficient performance nor prejudice. *See Simon II (State Habeas)*, 857 So. 2d at 686–87. As to the suppression hearing, the court found that Simon's family members' testimony would have added nothing to the evidence that counsel did introduce. *Id.* The court first noted that the family members' testimony was both self serving and hearsay, and it would likely have drawn a successful objection from the prosecution. *Id.* at 687. Putting that issue aside, the court found that the family members' testimony would have merely repeated what Simon had told them, which Simon had already introduced through his own testimony. *Id.* According to the court, the only independent information in their testimony—personal observations of Simon's injuries—would have been of little value. *Id.* The court also noted that these injuries could have had sources other than the police. *Id.*

As to the trial, the court again found that Simon's family members' testimony would not have survived an objection by the State. *Id.* As Simon did not testify at the trial, his family members also could not have been used to corroborate his claims of physical abuse. *Id.* Finally, the court noted that Simon's trial counsel would have had to overcome the adverse suppression ruling. *Id.* The Supreme Court of Mississippi thus held that Simon's trial counsel's decisions were strategic and therefore not deficient under *Strickland*. *Id.*

The court also addressed *Strickland*'s second component, prejudice. It noted that Simon's testimony at the suppression hearing was sufficient to raise the issue of whether his confession was voluntary. *Id.* As to the trial, the court

13

determined that even if the jury had heard the family members' testimony, it would have little reason to disregard Simon's confession because "there [was] little else in the record to establish its involuntariness." *Id.* Moreover, regardless of the confession, there was substantial evidence of Simon's guilt:

> Had Simon's confession to police been excluded, there would still exist his inculpatory statements to his cellmate, his presence during the robbery to get the guns used in the murders, the Parkers' belongings found at his Memphis apartment, his observed flight from the Parkers' pickup truck the night of the murder, and the fact that he was wearing some of the clothing stolen from the Parkers when he was arrested.

*Id.* Thus, the court concluded, "Simon fail[ed] to demonstrate how trial counsel's failure to call his family members at the suppression hearing and trial prejudiced the trial court's ruling on the issue or the outcome of the trial itself." *Id.*

The district court held that the Supreme Court of Mississippi had not erred in its assessment of this ineffective-assistance claim. The court paid special attention to the details of Simon's injuries, noting that the injuries Simon's family members observed (swollen eyes and mouth) were inconsistent with Simon's claims of abuse (choking and being placed on the floor with a boot or knee in his back). *See Simon II (Federal Habeas)*, 2007 WL 4292498, at *14. The district court also looked to the time frame of the injuries; Simon's confession (and thus any concomitant abuse) occurred two days after his arrest, yet his family members did not see him until two weeks after his arrest. *Id.* The court further noted that Simon made his initial appearance before a judge one hour after giving his statement but there was nothing in the record to suggest that he had been beaten prior to that appearance. *Id.* Finally, the district court thought that there was sufficient testimony to show that Simon's confession was voluntary. *Id.* Thus, the district court concluded, the Supreme Court of

Mississippi did not err in its application of *Strickland*. *Id.* The district court later denied a COA on this claim, concluding that the decision whether to call the witnesses was one of trial strategy and that Simon had not demonstrated that the family members' testimony would be either admissible or favorable. *See Simon II (Federal Habeas, Denial of COA)*, 2008 WL 762182, at *6.

We do not find the district court's resolution of this issue to be debatable among jurists of reason. It appears that Simon's trial counsel had two possible theories for arguing that the confession was coerced: psychological and physical. The case for psychological coercion was not insubstantial. At the suppression hearing, Simon's trial counsel pushed the theory that fear of mob violence caused Simon to confess. The testimony of various witnesses indicates that members of the community were incensed at the Parkers' murder and that there was a potential for violence against the suspects. Simon's trial counsel also emphasized the questionable circumstances of Simon's confession; police did not present Simon to a judge until after the confession, and his counsel implied that they were trying to extract a confession before Simon invoked his right to counsel. Finally, Simon's trial counsel suggested various racial undertones in Simon's arrest and confession.

In contrast, the case for physical coercion was quite weak. Only two witnesses mentioned that Simon had been physically abused. The first was only in passing; Robert Brown, who shared a cell with Simon shortly after he confessed, testified that Simon had said that the interrogators had beaten him. The only other testimony as to physical abuse came from Simon himself. The first alleged act of abuse occurred over a day before Simon's confession. Simon testified that, while being held awaiting transfer to another prison, a police officer slapped him in the right ear. The other two alleged acts of abuse occurred during the interrogation that led to Simon's confession; Simon testified that one

police officer choked him and threw him to the ground, at which point another officer put his knee or boot in Simon's back.

On rebuttal, every officer accused of abusing Simon resolutely denied any misconduct, as did any officers present when the abuse allegedly took place. Before hearing from Simon's psychologist (who had to testify later due to a scheduling conflict), the trial court expressed its belief that Simon had voluntarily confessed. But it reserved a final judgment on the issue until hearing from the psychologist. Although the psychologist's testimony (as well as the parties' final arguments and the court's ruling) do not appear to be in the record, we know that the court eventually ruled that Simon's confession was voluntary.

The testimony of Simon's family members would have added little to his case for physical coercion. Whatever it might have added would also be easily challenged on cross-examination. The family members saw Simon roughly two weeks after his confession—and the alleged abuse—occurred. A number of intervening acts (including, for example, *later* beatings from police or prisoners) could have caused the injuries. Further, no one who saw Simon shortly after he confessed—including the counsel appointed after the confession—said anything about physical injuries like those described in the family members' statements. Indeed, after the confession and alleged beating, Simon was brought before a judge for his initial appearance, and he points to nothing in the record where anyone even remarked on any signs of abuse.

In short, Simon has not shown that his trial counsel made anything other than a tactical decision to pursue the relatively stronger theory of psychological coercion over the relatively weaker theory of physical coercion. Although ultimately unsuccessful, Simon's trial counsel presented a reasonable argument that police concocted an atmosphere of fear that led Simon to confess. In

contrast, Simon's trial counsel had little evidence to support an argument that the confession was physically coerced, and most of it (including the testimony of Simon's family members) was weak. Moreover, Simon's trial counsel was probably reasonably reluctant to offer the testimony of Simon's family members, as their statements on physical coercion would be quite open to challenge on cross-examination. We do not find the district court's resolution of this claim debatable and therefore deny a COA.

## C.    Failure to Use Extra For-Cause Challenges at Jury Selection

Simon next argues that his counsel was ineffective in failing to use extra for-cause challenges at jury selection. The parties do not dispute that, before the trial in *Simon I*, the State engaged in substantial misconduct in the form of pretrial publicity. Shortly after Simon's arrest, a prosecutor held a press conference at which he announced the murders and Simon's link to the crimes. As the prosecutor said nothing about the presumption of innocence, this press conference violated local ethical canons. Police officials were also publicly commenting on the crimes in violation of local rules. Finally, after the trial court had set up procedures to protect Simon from improper disclosures, the State improperly filed a public motion containing false information about Simon, including an alleged jailhouse confession. Upon finding that the State had engaged in misconduct, the trial judge moved the trial to another county.

Simon asserts that the State conceded that any juror exposed to pretrial publicity should be struck for cause. When Simon's trial counsel later tried to challenge five jurors exposed to pretrial publicity, the trial court determined that the challenged jurors could set aside what they had heard and denied the for-cause challenges. Simon contends that his counsel should have invoked the State's alleged concession that any juror exposed to pretrial publicity should be struck for cause. According to Simon, counsel's failure to do so was deficient

17

performance that resulted in the seating of possibly prejudiced jurors.

The Supreme Court of Mississippi rejected Simon's argument on this point. *See Simon II (State Habeas)*, 857 So. 2d at 690–92. The court found that the State had indeed made a concession regarding the striking of jurors exposed to pretrial publicity, but not to the extent that Simon suggested. *Id.* at 691. Specifically, the State admitted that any juror who was contaminated by pretrial publicity (such as one who could not lay aside what she had heard or who had already formed an opinion) should be struck for cause, but did not concede that Simon was entitled to extra or special for-cause challenges for *any* juror exposed to pretrial publicity. In the court's words,

> It is a fair reading of the transcript that the State made such a concession during consideration of the motion to dismiss. From the context of the hearing, we find that the State was merely repeating the standard routinely applied by trial courts to motions to strike jurors "for cause."

*Id.* at 691–92. According to the Supreme Court of Mississippi, then, the only concession that Simon's counsel could invoke was the State's concession that the normal standard for for-cause challenges applied to jurors exposed to pretrial publicity.

The court went on to find that any failure to remind the trial judge of this concession was not deficient performance. It first noted that striking jurors for cause is left to the discretion of the trial judge, and none of the jurors in question met the standard required for a for-cause strike. *Id.* at 692. The court stated that "[e]ach of the jurors in question indicated that they could put aside any conclusions they had formed from their exposure to the publicity in this case and be fair and impartial during the trial." *Id.* It also noted that Simon's counsel had sufficient peremptory challenges to strike each of the jurors unsuccessfully challenged for cause. *Id.* According to the court, "[t]he fact that these particular

18

jurors were ultimately seated without being peremptorily struck indicates they were satisfactory to Simon from a strategic standpoint." *Id.* And as to Simon's counsel's failure to invoke any concession by the State, the court found that the success of such an invocation depended on the discretion of the trial judge:

> If Simon's trial counsel had reminded the trial court that the State had made this concession before the change in venue, it is possible the judge might have stricken the jurors "for cause." However, the trial judge was certainly not bound to enforce the State's concession.

*Id.* The court thus concluded that the State had not conceded that Simon should have extra or special for-cause challenges and that any failure by Simon's counsel to invoke the State's actual concession was not deficient:

> [W]e conclude that the context of the concession by the State did not empower Simon's trial counsel to automatically exclude "for cause" all members of the venire exposed to pretrial publicity. Trial counsel was not deficient for failing to remind the trial judge of a non-binding and unenforceable concession made by the State in the course of discussing options to remove the taint of pretrial publicity from the trial jurors.

*Id.* Finally, the court noted that Simon could not satisfy *Strickland*'s prejudice component. According to the court, Simon's counsel's failure to strike the challenged jurors peremptorily "indicate[d] a non-prejudicial strategic decision was made to include them on the jury panel." *Id.*

The district court agreed with the Supreme Court of Mississippi that "[t]he transcript of the pretrial hearing makes it clear that the prosecutor was merely asserting that those jurors tainted by pretrial publicity should be removed for cause." *Simon II (Federal Habeas)*, 2007 WL 4292498, at *10. The court therefore concluded that Simon's "[t]rial counsel was not deficient in failing to remind the trial court that the prosecutor knew the standard for removing jurors for cause." *Id.* The district court also found no prejudice, believing that the real issue was "whether the jury that sat was impartial." *Id.* The court saw "no

indication that the seated jurors were not impartial" and dismissed any notion that the use of peremptory challenges to remove certain jurors entitled Simon to relief. *Id.*

Simon does not indicate where in the record this concession took place. But both the Supreme Court of Mississippi and the district court looked to a pretrial hearing where Simon and his co-defendant, Anthony Carr, moved to dismiss their indictments due to improper pretrial publicity. During that hearing, the trial court described a section of the State's brief which arguably includes the concession that Simon alleges:

> I do understand that the State admits in its brief that one of the remedial measures that might be taken, on page five of the brief,[ ]counsel states that jurors may be dismissed for cause during voir dire if pre-trial publicity has reached a prospective juror. That may make it difficult throughout, but I understand that's an admission as a remedial measure. And, further on the same page that jurors should be excused if there is any doubt about their impartiality, referring to the State's brief at this time.

Later, in an exchange with the court about a potential change of venue, the State seemed to clarify the statement in its brief:

> BY THE COURT: And, I believe you suggested in your brief that if we go to another county, and if we find any juror during voir dire that the pre-trial publicity has reached, that juror should be excused for cause. That's what your brief says.
>
> BY [THE STATE]: Your Honor, of course—
>
> BY THE COURT: —And, otherwise, so we may go to two or three counties.
>
> BY [THE STATE]: Your Honor, if that juror when questioned on voir dire says that that juror has been contaminated with the virus and cannot lay aside anything that that juror may have heard or read, and has formed an opinion, well, certainly, that juror would have to be excused. And, if that juror—
>
> BY THE COURT: —*That's the normal thing.* What remedial

> measures do we have because of this, regardless of how it came about? I'm asking counsel for both sides. What is the remedy, because it is out, because all these things through these filings of these two responses, which should never have been.

(emphasis added). Reading these two sections in tandem, it appears that Simon has misconstrued the State's admission. Any concession regarding striking jurors exposed to pretrial publicity was merely an admission of the normal standard for striking such jurors. The State did not agree to a remedy in the form of striking *any* juror exposed to *any* pretrial publicity. Indeed, throughout its closing argument, the State repeatedly emphasized that the proper remedy for the pretrial publicity was a change of venue. Although the State at one point also said that "extensive voir dire" would be appropriate, Simon points us to nowhere else in the record where the State indicates that *any* juror exposed to *any* pretrial publicity should be struck for cause.

Simon's claim on this point thus fails at step one; his counsel could not have rendered ineffective assistance by failing to invoke a concession that the State never actually made. The Supreme Court of Mississippi correctly addressed this claim, and the district court's resolution is not debatable. We therefore deny a COA.

## D.   Failure to Rehabilitate Prospective Jurors

Finally, Simon contends that his counsel provided ineffective assistance as to the rehabilitation of several potential jurors. During voir dire, several jurors indicated that they would refuse to vote for the death penalty. Simon's trial counsel attempted to rehabilitate a particular juror who had expressed such a refusal. After Simon's counsel asked this juror whether she could "consider" imposing the death penalty even though she did not believe in it, the State objected to counsel's use of the word "consider." The trial judge sustained the objection, noting that the substance of the question had already been asked and

answered three times. Simon's trial counsel then moved on to questioning the venire about exposure to pretrial publicity.

Simon raises three issues stemming from this effort at rehabilitation. He first argues that his counsel rendered ineffective assistance by not objecting to being "cut off" or not asking the same question of other jurors who had expressed a reluctance to impose the death penalty. Second, Simon contends that after these jurors had been struck for cause because his counsel had only partially rehabilitated them, his counsel rendered ineffective assistance by not pointing out to the trial judge that he had cut short efforts at rehabilitation. Finally, Simon asserts that the State was allowed to rehabilitate jurors that Simon wished to strike for cause, and his counsel rendered ineffective assistance by not objecting to the trial court's disparate allowance of rehabilitation.

### 1.    *Failure to object when "cut off"*

As to Simon's first claim, he suggests that his counsel should have persisted in questioning potential jurors about their views on the death penalty or objected to the trial judge's "cutting off" his opportunity to rehabilitate jurors with beliefs against the death penalty. Simon notes that five jurors whom the State later challenged due to their refusal to impose the death penalty had indicated that they could follow the court's instructions and determine guilt without regard to their views on the death penalty: Ethridge, Craigen, Dickerson, Tinnell, and Williams. Simon suggests that these jurors were partially rehabilitated and that his trial counsel should have continued attempting to rehabilitate them. He contends that counsel's failure to do so resulted in five jurors being needlessly struck for cause.

The Supreme Court of Mississippi rejected this claim, noting that the issue Simon suggests his counsel should have continued to pursue—whether those prospective jurors could ever impose the death penalty—"had indeed been

22

covered several times by the trial Court, the State, and Simon's trial counsel before" counsel was cut off. *See Simon II (State Habeas)*, 857 So. 2d at 693. Moreover, the jurors who Simon argues his counsel should have questioned were all "straightforward and unwavering in their opposition to imposing the death penalty." *Id.* Thus, according to the court, "the [trial] judge did not err in cutting off Simon's trial counsel's last attempt to rehabilitate them, nor was counsel's assistance deficient for failing to object to this preemption." *Id.*

The district court agreed with the Supreme Court of Mississippi, stating that the record did not support Simon's contentions. *See Simon II (Federal Habeas)*, 2007 WL 4292498, at *12. Indeed, the district court found Simon to be "tak[ing] liberties with the facts of the case by characterizing the trial court's statements as impeding his opportunity to rehabilitate potential jurors." *Id.* The district court thus found it reasonable for Simon's trial counsel to cease this line of questioning.

We do not find the district court's resolution of this issue debatable. The pertinent issue—whether particular jurors would refuse to impose the death penalty—had twice been covered before Simon's trial counsel began his voir dire. First, during the court's voir dire, the trial judge asked the venirepersons whether they would be able to impose a sentence of death. Several unequivocally indicated that they were not. Later, during the State's voir dire, counsel for the State twice asked the jurors whether they had changed their mind about their stated inability to return a sentence of death with no response. The State also asked whether anyone (besides those who had indicated earlier) could not impose a sentence of death, and one juror responded that she could not.

When Simon's trial counsel began discussing the issue, he first asked who on the venire did not believe in the death penalty. After roughly a dozen affirmative responses, counsel then asked whether those who did not believe in

the death penalty could follow the judge's instructions and decide guilt or innocence regardless of their feelings about the death penalty. Counsel received varying answers, some yes, some no, some not knowing. Counsel then asked the jurors whether they understood that a cross section of the community includes people who do not believe in the death penalty. The State objected to this question, and the trial judge sustained the objection.

Simon's trial counsel then attempted to restate the question to one particular juror:

> Now, those people that I just asked about the death penalty, the ones who do not believe in the death penalty, if you're selected on the jury, even though you do not believe in the death penalty—Ms. Ethridge, could you follow the law and consider whether or not it's appropriate or not, even though you don't believe in it.

The State objected to this question, noting that "the word 'consider' is not a part of it." The court then sustained the objection in detail:

> JUDGE PEARSON: The question has been asked about three different ways.
>
> MR. WALLS [Simon's trial counsel]: Your Honor, that's the question I wanted to pose to all those other jurors. Has the Court ruled I shouldn't ask that question?
>
> JUDGE PEARSON: The Court has asked this question, Mr. Walls, and this is the third different way that you've asked the same question. I'm sustaining the objection.
>
> MR. WALLS: All right. I have one other area, two quickly that I want to go into. . . .

Simon's trial counsel then went on to ask the venirepersons about what they had heard regarding the case.

Under these circumstances, it was not unreasonable for Simon's trial counsel to cease his efforts at rehabilitation. The substance of the pertinent question—whether jurors would refuse to return a sentence of death—had

already been covered. It was reasonable for counsel to move on to a different issue. Had Simon's trial counsel persisted in the above-quoted line of questioning, he likely would have drawn additional objections that the trial judge would have sustained. Instead of antagonizing the trial judge in front of potential jurors, counsel reasonably decided to move on.

Further, even if Simon's trial counsel could have tried to rehabilitate several of the jurors, his failure to do so was not deficient performance. A potential juror can be excused for cause if his or her views on the death penalty would prevent or substantially impair the performance of his or her duties. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Williams v. Collins*, 16 F.3d 626, 633 (5th Cir. 1994). A juror whose views on the death penalty prevent him or her from returning a sentence of death is therefore excusable for cause. *See Williams*, 16 F.3d at 633. And where attempts to rehabilitate a juror who has refused to impose the death penalty would be futile, refusal to engage in such useless efforts rarely constitutes deficient performance under *Strickland*. *See id*. Our review of the record reveals that four of the five jurors in question—Ethridge, Craigen, Dickerson, and Tinnell—squarely indicated that they could not return a sentence of death. Efforts to rehabilitate them would have been fruitless, and the performance of Simon's trial counsel was therefore not deficient.

The fifth potential juror, Williams, is a bit less clear. We could only find evidence that Williams did not "believe" in the death penalty. But we need not address whether counsel was deficient regarding Williams; even if we assume deficient performance, Simon cannot show that the exclusion of Williams prejudiced his trial. The jury in Simon's trial was selected from the first forty-four members of the venire, with three alternates selected from the first fifty-six. Williams was juror number seventy-two. Thus, even if Simon's trial counsel had

fully rehabilitated her, she would not have been on the jury that heard his case. Any failure to rehabilitate Williams, then, could not have prejudiced Simon.

### 2.    *Failure to object to State's for-cause challenges*

The State later challenged the five above-mentioned jurors for cause, and the trial judge excused all five due to their refusal to impose the death penalty. Simon contends that his counsel should have pointed out to the trial judge that his efforts to rehabilitate these jurors were cut off, and the failure to do so amounted to ineffective assistance.

The Supreme Court of Mississippi held that it was not deficient performance for Simon's counsel not to object when the trial judge stated that jurors struck for cause were only partially rehabilitated. *See Simon II (State Habeas)*, 857 So. 2d at 693. As "these jurors did not falter in their stated opposition to imposing the death penalty," they could be stricken for cause and any cutting short of trial counsel's questioning "had little, if any, effect upon the adequacy of their voir dire." *Id.* Thus, according to the court, Simon's trial "counsel did not render deficient performance in failing to remind the judge that he had been cut off in his futile attempts to rehabilitate these jurors." *Id.* The district court agreed, stating that each of the jurors in question were unequivocal in their inability to impose the death penalty. *See Simon II (Federal Habeas)*, 2007 WL 4292498, at *12. The district court also noted that, in addition to Williams, potential jurors Craigen, Dickerson, and Tinnell also were not among the first forty-four venire members and therefore "would not have been reached even if they had remained on the panel." *Id.*

We do not find the district court's resolution of this issue debatable. Again, four of the five potential jurors in question had squarely stated that they would refuse to impose the death penalty. Any further efforts to rehabilitate them would have been fruitless, and Simon's trial counsel was therefore not

deficient in failing to point out that his efforts at rehabilitating them had been cut short. And as to Williams, any failure to rehabilitate her did not prejudice Simon.

### 3. *Failure to object to disparate opportunities for rehabilitation*

Simon's trial counsel challenged several jurors for cause on the ground that they had said they would automatically impose the death penalty. The trial judge gave the State the opportunity to rehabilitate some of these jurors. Simon again contends that his trial counsel should have pointed out that the trial judge had cut short his efforts at rehabilitating jurors, and that his failure to do so constituted ineffective assistance.

The Supreme Court of Mississippi found no deficiency in Simon's trial counsel's performance on this matter. In the court's words,

> The record reflects that during the time jurors were being stricken "for cause," where the judge's notes were inadequate, incomplete, or where he considered them untrustworthy, he would permit an individual voir dire of that juror to clear things up. No objections were made to this procedure by either party. It benefitted both sides. That Simon's trial counsel did not object to the judge's allowing individual voir dire of jurors—where the State was successful in clarifying the judge's perception of those jurors in a way that possibly could be characterized as favorable to the State—was not the provision of deficient assistance.

*See Simon II (State Habeas)*, 857 So. 2d at 693. The district court similarly found no merit to Simon's allegations of deficient performance when the State was allowed to rehabilitate potential jurors, as both the State and defense were allowed to conduct individual voir dire. *See Simon II (Federal Habeas)*, 2007 WL 4292498, at *12.

Again, we do not find the district court's resolution of this issue debatable. The record shows that counsel for the State and Simon's trial counsel were both given the opportunity to question jurors when there was some confusion as to

what the juror had said. Further, as to four of the five jurors in question, any effort at rehabilitation would have been fruitless. And any failure to rehabilitate Williams was harmless.

In sum, the district court held that the Supreme Court of Mississippi's resolution of Simon's ineffective assistance claims regarding rehabilitation was proper. The district court's resolution of this issue is not debatable, and we therefore deny a COA on this claim.

## IV. CONCLUSION

We grant a COA on Simon's claim that his counsel rendered ineffective assistance at sentencing. We request that Simon provide supplemental briefing on this claim within thirty days of the date of this order. The State should file a response within fifteen days thereafter, and Simon may file a reply within ten days after the State submits its brief. We ask that the parties address the following issues:

1.  Under *Strickland*, was it deficient performance for Simon's trial counsel not to investigate Simon's history of familial abuse?

2.  If the jury had heard evidence of Simon's history of familial abuse, is there a reasonable probability that it would not have returned a sentence of death?

3.  Considering that neither the Supreme Court of Mississippi nor the district court held an evidentiary hearing to determine the actual contours of Simon's trial counsel's investigation, what must we assume for the sake of this appeal? Further, if we find Simon's claims to be meritorious, should we remand his petition to the district court for an evidentiary hearing?

We deny Simon's request for a COA on his remaining claims of ineffective assistance. The certificate of appealability is therefore GRANTED in part and

DENIED in part, and additional briefing is requested.

GRANTED in part, DENIED in part, additional briefing requested.